185

1    Q.    So is it your testimony that these positions were not

2    posted?

3    A.    I don't know if they were posted.

4    Q.    The first one is a business adviser position?

5    A.    Right.

6    Q.    Who received that position?

7    A.    Don Switzler.

8    Q.    Where was the position located?

9    A.    In central PA, Lancaster, Harrisburg, York area.

10   Q.    Do you know when he received it?

11   A.    I don't know exactly, no.

12   Q.    And you did not apply for that position; is that

13   right?

14   A.    I did not, no.

15   Q.    You're claiming that you're more qualified than him?

16   A.    I'm slightly more qualified than him, yes.

17   Q.    But you didn't even apply?

18   A.    Because I didn't know at that point that I had to

19   apply.  I was operating under the assumption that I could

20   be reassigned.

21   Q.    And the sixth position that you're claiming is what?

22   A.    The business banking sales manager in York County.

23   That was given to Terry Bender who had only been with the

24   bank six months and had no management experience in his

25   entire career.

1  Q.   So that's essentially what Mr. Shoemaker was,

2  business banking sales manager?

3  A.   Yes, what they did was they realigned the territories

4  when Shoemaker left so Klinger came to Shoemaker's role

5  and Klinger's role was somewhat -- or Klinger's territory

6  was changed.

7  Q.   Did you apply for that position?

8  A.   I did not because I did not -- I assumed I did not

9  have to apply for it.

10  Q.   You based that assumption on what?

11  A.   On the law.

12  Q.   We talked a little bit about your depression.  What

13  sort of medication do you take for your depression?

14  A.   Lexapro --

15  Q.   What else?

16  A.   -- once a day.  For my depression?  That's it.

17  Q.   How does your depression affect your daily life?

18  A.   It varies.  I mean it doesn't unless I have an

19  episode.  It could be brought on by changes in other

20  medications or stress or -- but typically it's very

21  manageable.

22  Q.   Your ADD, how does that impact your daily life?

23  A.   I have to take medication twice a day and it helps

24  me -- the medication helps me to focus.  It does, however,

25  require, you know, very specific timing as to taking it or

Kosakoski, Shirley

1   it can keep me up at night, and that can have other

2   impacts.

3                  And I just know what I'm good at with the

4   ADD and what I'm not.  For example, I do have an admin now

5   and I've always had an admin when I've been in a position

6   of high responsibility or high expertise to do my filing

7   and record keeping and reporting and basically my

8   secretarial work.  And that's what I was asking for at

9   PNC.

10                            -  -  -

11                 (Whereupon the document was marked, for

12                  identification purposes, as Plaintiff's Exhibit

13                  Number 8.)

14                            -  -  -

15   BY MR. LIEBERMAN:

16   Q.   Here is a copy of the complaint.  Did you review this

17   before it was filed?

18   A.   I reviewed it, yes.

19   Q.   Now, as part of your complaint you allege that you

20   were discriminated against because of your age; is that

21   right?

22   A.   That's a part, yes.

23   Q.   Are there any comments from your managers or anyone

24   at PNC to support your claim of age discrimination?

25   A.   I'll go back to the comment of Shoemaker saying that

Kosakoski, Shirley

1      that I talked to them about this over a year ago and I

2      wanted to do things differently and I needed a change.

3      Q.   Who are you claiming discriminated against you

4      because of your age?

5      A.   PNC in general, HR.

6      Q.   Who specifically at PNC?

7      A.   Shoemaker for one.

8      Q.   Anybody else?

9      A.   Well, I suppose anybody that hired -- for example,

10     Lori Christian, Lori Lockard.

11     Q.   How did Mr. Shoemaker discriminate against you

12     besides selecting Adam Althouse as the treasury manager?

13     How did he discriminate against you because of your age?

14     A.   With him it was more of a -- it was an attitude and

15     it was giving preferential treatment to the males in our

16     department.  Again, like I said, giving them sales credit

17     for things, giving them positions that they weren't

18     qualified for.

19     Q.   Other than what was discussed, what positions?

20     A.   John Martin, for example, was a branch manager who

21     moved into business banking.  Again, another young man who

22     worked in the southern end of Lancaster County.  And Bob

23     was very familiar with that area, and the guy had -- he

24     was a golf pro and he decided to try banking, and within a

25     year he was a business banker because Bob liked him.

1    Q.   Did you apply for the position that Mr. Martin

2    received?

3    A.   No.

4    Q.   So you're not claiming that Mr. Shoemaker selected

5    Mr. Martin for a position over you?

6    A.   Over me?  No.  No, I'm saying in general that was his

7    operating --

8    Q.   But how did that impact you or your employment, the

9    fact that he hired John Martin?

10    A.   Directly, it didn't impact me, but indirectly it

11    was -- you know, it goes to the constant, the day-to-day,

12    the environment of, you know, if you're young and you're a

13    male, you get priority, special treatment.

14    Q.   How old were you when Mr. Shoemaker hired you?

15    A.   46.

16    Q.   Were you a male at the time?

17    A.   No.

18    Q.   Were you young?

19    A.   Well, I was over 40, and they were all in their 20s

20    and 30s.

21    Q.   How else did he discriminate against you because of

22    your age?

23    A.   I probably don't have specifics that I can think of

24    off the top of my head.

25    Q.   And you mentioned Lori Christian.

1    A.    -- and I had to run up and down and across.

2    Q.    You were supporting one branch; is that right?

3    A.    I was supporting one branch, yes, in addition to the

4    credit that was given to me -- the credit customers that

5    were given to me.

6    Q.    The credit customers that were given to you?

7    A.    The credit -- the things that I told you about

8    earlier, what I call the run-around deals, the bogus deals

9    that they knew they weren't going to approve that they

10   wanted me to work on.

11   Q.    And you also claim gender discrimination in your

12   complaint.  How did the bank discriminate against you

13   because of your gender?

14   A.    Again, it goes back to, I believe, Bob Shoemaker.

15   And I believe that funneled downed from Ginder and Sposito

16   giving priority to their male friends and male advocates

17   on the outside as opposed to accommodating my request for

18   reassignment.

19   Q.    Did Mr. Ginder select Robert Walter?

20   A.    No.

21   Q.    Do you know if he had any influence on the selection

22   of Mr. Walter?

23   A.    He might have.  I don't know.

24   Q.    You have no facts to support that?

25   A.    No, and I never claimed to have facts to support

Kosakoski, Shirley

1    Q.   You have no facts to support that?

2    A.   One of the other Sterling executives that was very

3    close with that group was Greg Lefever and he was a

4    director in the wealth management group as well.   So, you

5    know, I'm certain that he was another very good friend of

6    Shoemaker and Ginder, and so I'm sure that there was some

7    influence there, I'm quite certain.   I didn't know that

8    for a fact, but it seems a little obvious, yeah.

9    Q.   Are there any other comments made from managers about

10   your gender that support your claim of gender

11   discrimination?

12   A.   No, there weren't comments.

13   Q.   Are you claiming that Mr. Shoemaker and Mr. Ginder

14   socialized out with employees from the bank?

15   A.   Well, they did.   I don't know if I'm...

16   Q.   Were they only male employees that they --

17   A.   Shoemaker and Ginder?   I -- I don't know that Ginder

18   did.   I know that Shoemaker did.   He made a comment to me

19   one time about him and some of the guys go out for drinks

20   on Friday afternoons.   And maybe that's my problem, maybe

21   I need to loosen up and go have a beer with them sometime.

22   But other than that, I don't know because I didn't go.

23   Q.   Were there other females, high-level female

24   executives at PNC?

25   A.   Certainly.

204

1    What the specifics were?  I can't give you that, but it

2    had an impact.

3    Q.   And you base your belief on that on just your

4    feeling?

5    A.   And my experience in general in business; and, yeah,

6    my experience and my assumptions.

7    Q.   Now, looking at your complaint, paragraph 42.  It

8    says that after you got this written counseling you made a

9    complaint to HR through the employee relations hotline.

10   Is this the first complaint you made about alleged

11   retaliation and discrimination?

12   A.   Yes.

13   Q.   Who from PNC investigated that complaint?

14   A.   Initially Gail Dampman and then it was turned over to

15   Karen Barber.

16   Q.   In paragraph 47 it again says there were no women in

17   his Rising Stars group?

18   A.   That's my knowledge.  To the best of my knowledge,

19   there was not.

20   Q.   Paragraph 50 and 51, "Earlier in 2009, Plaintiff had

21   posted for a different position."  What position was that?

22   A.   Early in 2009 was the treasury management.

23   Q.   Do you have any reason to doubt that you applied for

24   that position on September 25, 2008?

25   A.   No, it could've been.  I remember that it took a

Kosakoski, Shirley

1  long, long time for them to even interview.  They didn't

2  interview us until Thanksgiving or Christmas time, and

3  then the position was filled in January of '09, actually.

4  That's when the person started.

5  Q.  Do you have any reason to doubt that the selection

6  was made on November 5, 2008?

7  A.  It could've been.  I mean, it was late in '08.

8  Q.  Paragraph 57 says, "Plaintiff again requested a

9  lateral move and asked Lori Lockard, Employment Relations

10  Specialist, to recommend Plaintiff's transfer, which she

11  would not do."  When you requested a lateral move, what

12  did she tell you?

13  A.  Initially she wouldn't give me an answer.  And then

14  when I pressed her on the matter she said, it's not our

15  policy to do that.  And I requested it as a reassignment,

16  it's not a lateral move.  I said, would you please

17  reassign me if I -- you can't do these accommodations and

18  Bob is leaving, now would be a good time just to get a

19  fresh start and I would like to be reassigned.  And she

20  said, that's not our policy, we don't reassign.

21  Q.  So isn't it true that she told you that you needed to

22  identify a position and apply for it?

23  A.  Well, yes, because I asked her.  I said, well, how do

24  I get reassigned?  And she said, you have to post for the

25  position like any outsider would do.

Kosakoski, Shirley

1     Q.   Paragraph 59 says, "Plaintiff was informed by HR that

2     Plaintiff and Walter were equivalent with respect to their

3     abilities."  Who informed you of that in HR?

4     A.   I don't remember who actually I spoke to in HR, but I

5     know in the course of the interview that's what I was

6     told.  We were equivalent and it's just a matter of who

7     Shane picks.

8     Q.   Who said this?

9     A.   It could've been Carole Yon if it wasn't HR, but it

10    was in the HR process.

11    Q.   So it's your testimony that Ms. Yon discussed the

12    other candidate with you during the interview?

13    A.   Well, she did, yeah.  She just said that we're both

14    equivalent with, you know -- she said you have very

15    equivalent abilities, she said, just that they're

16    different, yours are in credit and lending --

17    Q.   Did you discuss experience?

18    A.   -- and his are in wealth management.

19    Q.   The position was a wealth management position,

20    correct?

21    A.   Yes.

22    Q.   61 says, "Plaintiff had also requested, in addition

23    to administrative support, that she be moved to a branch

24    office."  You claim in 62 this accommodation was "entirely

25    ignored."

1    Q.   Now, paragraph 75 talks about "two promotions were

2    granted to male employees with less experience and fewer

3    qualifications than Plaintiff."  Are those the two

4    promotions that we've discussed that you did not apply

5    for?

6    A.   Yes.

7    Q.  And 78 says, "However, Plaintiff was never considered

8    for either of them."  But you've admitted you didn't even

9    apply for them; is that right?

10    A.   No, I didn't apply for them because I didn't think I

11    had to apply for them.

12    Q.   Now, have you spoken to anyone besides your attorney

13    about this case?

14    A.   My husband.

15    Q.   Anybody else besides your husband?

16    A.   Just my therapist.  I mean, not the details of the

17    case just the --

18    Q.   Have you spoken to any other employees of the case?

19    A.   Employees at PNC?

20    Q.   Yes, former or current.

21    A.   No -- well, one in a very vague manner because she's

22    my best friend.  She's been my best friend for many years,

23    before we both worked at PNC.  And I just told her, look,

24    you may hear things and there is a lawsuit, and I'm not

25    going to discuss it with you because I don't want to put

212

1          identification purposes, as Plaintiff's Exhibit

2          Number 9.)

3                          - - -

4     BY MR. LIEBERMAN:

5     Q.    I'm showing you Exhibit Number 9.

6     A.    (Reviewing document.)

7     Q.    Do you recognize that document?

8     A.    Uh-huh.

9     Q.    That PNC's Code of Ethics?

10    A.    Uh-huh.

11    Q.    This was available to you online?

12    A.    Yes.

13    Q.    Do you recall reading it?

14    A.    Yes.

15    Q.    If you turn to page PNC 670.  There's a section there

16    "Protection from Retaliation".  Were you aware that?

17    A.    Yes.

18    Q.    Does PNC have other policies regarding performance

19    management?  Corrective action?

20    A.    Other policies than what?

21    Q.    Other than the conduct method policy here, did they

22    have other policies regarding if an employee was not

23    performing regarding their steps of discipline or steps of

24    counseling?  Verbal, written?

25    A.    Sure, yes.

Kosakoski, Shirley

1    Q.    Do you want to take a quick break?

2    A.    Okay.

3         (Whereupon there was a recess in the proceeding.)

4    BY MR. LIEBERMAN:

5    Q.    Now, in September of '09 you said you had a

6    discussion with your manager, Mr. Shoemaker, about your

7    performance; is that right?

8    A.    Yes.

9    Q.    Can you tell me everything you remember about that

10   discussion?

11   A.    What I remember is we looked at the numbers and the

12   sales reports and reviewed what the goals -- what the

13   targets were and what the actuals were.  I don't recall

14   exactly what they were, but for -- I guess in September it

15   would've been -- I don't know if it was for the second

16   quarter and then whatever to-date in the third quarter.

17   And then we would discuss what types of activities we were

18   doing, what other problems we were having, sales and

19   service issues, things like that.

20   Q.    Were you having those periodically, those

21   discussions?

22   A.    Yes, we had them at least -- I believe it was monthly

23   at that point.  So, yeah, that was the gist of our

24   conversation.  And then he said that -- that's when he

25   said that this year it's not really -- you know, we're in

1   Q.   And you didn't feel that was a verbal warning?

2   A.   No, because we got that every month.   Every month

3   that we had a sit-down with him, he gave us an outline of

4   what we talked about.

5   Q.   Now, ultimately you received some counseling for your

6   performance; is that correct?

7   A.   In January, the following January.

8   Q.   And then from Mr. Klinger as well?

9   A.   Yes.   Yes.

10  Q    Are you aware of any other business banker or

11  Business Banker IIIs who were not meeting their goals?

12  A.   Well, I know there were some that weren't meeting

13  their goals, yes.

14  Q.   Do you know if they were counseled?

15  A.   I don't know that for fact.   I assume so because

16  that's -- that was the standard, but I don't know that for

17  fact.

18                           - - -

19                (Whereupon the document was marked, for

20          identification purposes, as Plaintiff's Exhibit

21          Number 10.)

22                           - - -

23  BY MR. LIEBERMAN:

24  Q.   Ms. Kosakoski, Exhibit Number 10 appears to be a

25  performance appraisal.   First of all, do you recognize the

Kosakoski, Shirley

1    top one?

2    A.    Yeah, I recognize it, yes.

3    Q.    On the second page, PNC 180, is that your signature?

4    A.    Yes.

5    Q.    That was received from you December 2, 2009?

6    A.    It was.  However, at the time I received it, it

7    didn't have this "'08, '09 Performance Appraisal" at the

8    top.

9    Q.    So this appraisal was for the period from May of '08

10   to May of '09?

11   A.    Yes, because Bob had sent me an email in the fall

12   saying, oops, I forgot to do your review this year.

13   Q.    Do you know why he forgot to do your review?

14   A.    He said -- no, he just said he forgot, so that was

15   the only explanation I got.  And he apologized but he said

16   I fell through the cracks somehow.

17   Q.    Now, when he gave you this appraisal in December of

18   '09 for the period of May '08 to '09, he already had

19   talked to you in September of 2009 about your performance,

20   correct?

21   A.    Yes.

22   Q.    This rating you received was an "achieves"; is that

23   right?

24   A.    Yes.

25   Q.    Looking at the last two pages, is this the document

Kosakoski, Shirley

1    that you discussed in September of '09?

2    A.   It looks like it, yeah.

3    Q.   First of all, what are DDAs?

4    A.   Checking accounts.

5    Q.   He wrote here checking accounts through June, you had

6    9 versus goal of 24 or 38 percent of that goal.  Do you

7    dispute that?

8    A.   No.

9    Q.   What are merchants?

10   A.   It's referrals to our merchant services division for

11   business customers to utilize PNC credit card processing.

12   Q.   And you had five versus six or 83 percent of that

13   goal for June?

14   A.   Uh-huh.

15   Q.   What are treasury revenue credits?

16   A.   They would be cash management, sales, credits.  They

17   did not award you tick marks per account, it was more

18   various products and services were assigned values, and

19   credits were the value.

20   Q.   And you were at 48 percent of the goal?

21   A.   Uh-huh.

22   Q.   Is that a yes?

23   A.   Yes.  I'm sorry.

24   Q.   Total revenue credits, what are those?

25   A.   Again, if you added up all the various sales, product

218

1    sales, each product has various credits assigned to it.

2    Q.    So they had certain values in credit?

3    A.    Yes.

4    Q.    You were at 34 percent of that goal?

5    A.    Yes.

6    Q.    Total loan origination for June, you were at 40

7    percent of the goal?

8    A.    Yes.

9    Q.    Did Mr. Shoemaker in September of '09, when he gave

10   this to you and discussed your performance, express

11   concerns with those numbers?

12   A.    Well, he expressed that -- I wouldn't say concerns.

13   We were looking at why they were what they were, and there

14   were some very good reasons.  And we were looking at how

15   to move forward to accomplish -- if you look at the bottom

16   of page 181, it says the expectations and priorities were

17   to achieve in a rolling three-month period the components

18   of production.  And the production at the top that was

19   actually achieved was the full goal, not the ramp-up

20   goals.  So the ramp-up was achieved because I was paid the

21   bonuses for achieving the ramp-up goals.  These were the

22   full goals.

23   Q.    But he's telling you moving forward, the ramp-up

24   goals are now --

25   A.    They're up to --

Kosakoski, Shirley

1    Q.    -- full?

2    A.    You have to hit 100 percent starting --

3    Q.    In the very middle of the page he also writes,

4    "Challenges remain in dedicating sufficient time in each

5    location to be a true ally to branch teams.  Meetings

6    frequently need re-scheduled due to current events.

7    Overall, confidence of branch managers needs to increase."

8    Do you recall discussing that in September of '09?

9    A.    Yes.

10   Q.    So that was an issue in September of '09?

11   A.    It was, yes.

12   Q.    Are you aware whether any of the branch managers had

13   complained about you?

14   A.    No, and, in fact, I asked if they had complained and

15   he said he was just going by observations, so whatever

16   that meant.  I don't have --

17   Q.    You asked Mr. Shoemaker?

18   A.    I did, yes.

19   Q.    Are you aware whether the regional manager complained

20   about you?

21   A.    I was not made aware that she did, no.

22   Q.    Are you aware if any customers complained about you?

23   A.    Not at that time, I'm not aware. I'm mean, I'm

24   certain -- there were customer complaints constantly

25   because they didn't like the fact that their small local

Kosakoski, Shirley

1    that their product was a business banking product.

2              So these were identified.  We identified

3    them, Bob and I, and we found that they were not my

4    issues.  I never interacted with these customers.  I

5    remember this very clearly.

6    Q.   She also says in her email, "I know there have been

7    times when Sue or her team make referrals to Shirley and

8    she takes days sometimes to reach out to the customer."

9    Is that true?

10   A.   No, and she has no documentation to prove that.

11   Q.   You're saying it's not true?

12   A.   No, it's not true.

13   Q.   What is the 24-hour response time?

14   A.   Her goal was to have a 24-hour response time to

15   customers who called in.

16   Q.   And it's your testimony that you sat down with

17   Mr. Shoemaker and looked up these particular clients?

18   A.   Yes.

19   Q.   And none of them were yours?

20   A.   They were not or they were -- well, two of them were

21   actually service issues that business bankers were not to

22   deal with and --

23   Q.   You don't deal with service issues at all?

24   A.   Well, we weren't supposed to.  In fact, we were

25   supposed to give customers an 800 number to call for

230

1    service issues if the branch couldn't service it.  The

2    branch didn't like that and the customers didn't like it

3    so they, you know...

4    Q.   Did Mr. Shoemaker agree that none of these were your

5    customers?

6    A.   He did.  And I just want to add also to this.  A

7    customer with "a major problem," that's the customer's

8    opinion, first of all, if it's a major problem or it's a

9    minor problem.  And, secondly, it's their -- it's just

10   their rating of how they felt it was handled, and, you

11   know whether it was handled that way or not is not an

12   accurate reflection all of the time.

13                              - - -

14                 (Whereupon the document was marked, for

15            identification purposes, as Plaintiff's Exhibit

16            Number 13.)

17                              - - -

18   BY MR. LIEBERMAN:

19   Q.   I'm showing you Exhibit Number 13.  Do you recognize

20   this document?

21   A.   (Reviewing document.)

22            Yes.

23   Q.   This is a written warning that you received on or

24   about February 1, 2010.

25   A.   On or about, yes.

Kosakoski, Shirley

1    Q.   This is why you called HR telling them about

2    discrimination?

3    A.   Yes.

4    Q.   And you feel this was discriminatory?

5    A.   Well, it's inaccurate in terms of the production.

6    Q.   It's inaccurate in terms of production?  Why is it

7    inaccurate in terms of production?

8    A.   Because he did not give me credit for the sales that

9    I had made during the time.  And then he divided the sales

10    I had made by three months when it actually should've

11    divided by two months, which was the time that I was there

12    for that quarter.  So if you take the sales I actually

13    made divided by the time I was there, they're way off.

14    Q.   Did you have any other issues with the --

15    A.   With the numbers?  Well, the first issue is he never

16    told me -- and if you look at that document from

17    September, it never says anywhere there it was a verbal

18    warning.  And as I said, he always gave us an outline like

19    that with the agenda for discussion, so there was nothing

20    on there that indicated that was a verbal warning.

21    Q.   As part of your complaint in this federal lawsuit,

22    you're claiming that this written warning was

23    discriminatory, right?

24    A.   I believe the written warning here as it relates to

25    the production was retaliatory for taking the FML.

Kosakoski, Shirley

1    Q.   Did you lose any pay because of this?

2    A.   No -- well, I did.  Yes, I did because once this is

3    generated they put a rating in the system which does not

4    allow you to earn bonuses whether you earn it or not.

5    So --

6    Q.   Did you --

7    A.   -- Subsequent to that, had you earned it, you

8    couldn't -- you wouldn't get it anyway.

9    Q.   Did you earn any bonuses?

10    A.   No, I didn't.

11    Q.   So you didn't lose any money based on that?

12    A.   I didn't immediately lose any money, no.

13    Q.   And then you also allege, and I believe this is the

14    case, that the language in here you also take issue with

15    because you had a medical appointment on January 13, 2010;

16    is that right?

17    A.   Yes, uh-huh.

18    Q.   You're claiming that you were disciplined for not

19    attending a meeting?

20    A.   Yes, because of the disciplinary action here.

21    Q.   Specifically where does it say you were disciplined

22    for not attending the meeting?

23    A.   It says here that the expectations were partnering

24    with branch managers.  They met with him on January 13th

25    to express their frustration.  And when I asked him what

Kosakoski, Shirley

1    A.   That's what she said, yes.

2    Q.   Do you have any reason to doubt that it was

3    rescinded?

4    A.   Well, I have no reason to believe it was rescinded or

5    doubt that it was.  I have -- because I never got a

6    follow-up specifically with this.

7    Q.   Did you receive any subsequent written warnings,

8    written performance warnings?

9    A.   Not from Shoemaker.

10    Q.   But from Mr. Klinger?

11    A.   From Klinger, yes.  But, again, I --

12    Q.   Do you have any reason to doubt that the next step

13    after a written warning in the PNC world is a probationary

14    period?

15    A.   I don't have reason to doubt that because, again, I

16    had asked for accommodations before the warning was

17    written, and he was trying to set up a paperwork trail by

18    going back and referring to September -- which September

19    was never a warning in the standard practice that he had

20    established -- but in February he goes back and alludes to

21    September as being a warning.

22    Q.   So Ms. Barber said this was going to be rescinded or

23    revised?

24    A.   She said these numbers were wrong and they would be

25    revised and that they were working on it and there was a

Kosakoski, Shirley

235

1   lot of detail involved and they would get back to me.  And

2   that -- yeah, at first she said that it would be

3   rescinded, but then she said I still might receive some

4   kind of disciplinary action.  I never heard either way.

5   And in the mean time, I did ask her about my

6   accommodations, and that's when she said Lockard was

7   working on them.

8                            - - -

9                (Whereupon the document was marked, for

10          identification purposes, as Plaintiff's Exhibit

11          Number 14.)

12                           - - -

13   BY MR. LIEBERMAN:

14   Q.    Exhibit 14 is the same document with some handwritten

15   notes.  Is that your handwriting?

16   A.    Yes.

17   Q.    When did you write those?

18   A.    I believe it was the same -- February 1st.

19   Q.    And the revised numbers are, you believe, the correct

20   numbers he should have used; is that right?

21   A.    Yes.

22   Q.    Did you share this with Ms. Barber?

23   A.    Yes, I did, I believe.

24   Q.    Now, you explained that he threw out $1,000 in

25   revenue credits.  And also you state, "Counted my 30 day

Kosakoski, Shirley

1       FML time as active."

2       A.    Yes.

3       Q.    That was one of the issues you had with the

4       counseling?

5       A.    Excuse me?

6       Q.    That was one of the issues you had with the

7       counseling?

8       A.    The counseling?

9       Q.    With this particular counseling, that's one of the

10      issues you had with --

11      A.    That was, yes.  Yes.

12      Q.    And then you note here on the side in the paragraph

13      regarding the meeting, it says, "Noted to Bob that none of

14      this addressed on 9/10/09."

15      A.    Right, in September what he told me with the issuance

16      of this February document was that this was ongoing, the

17      managers were upset with me, and he didn't think I was --

18      Q.    He had never brought anything up similar?

19      A.    He never told me that.  He never brought it up.

20      Q.    He never brought it up before February of 2010?

21      A.    No, the only time it came up was January 13th when

22      they talked to him after the meeting that I missed.

23      Q.    You didn't mention in here about the fact of your

24      allegation that you're being counseled for taking FMLA

25      that day or going to an appointment, a medical

239

1      over who would have your employee file would know that.

2      I'm sure they would've given him a head's up.  And I said

3      that's really odd, but okay.  And he said, we'll continue

4      to work with them.

5                  And then I told him about the branch and

6      being down in North Pointe.  And he goes, yeah, why aren't

7      you down in North Pointe?  Why aren't you down in the

8      branch?  You should be sitting down there.  This is -- you

9      know, it's silly that you're up here.  That's -- you know,

10     standard procedure is to have you down there.  I said, oh,

11     I'm glad to hear you say that.  I was relieved, you know.

12     I just wanted to be able to do my job and to do it well,

13     and I've identified what I need to do it well and nobody

14     seems to want to take action.  So at that point I was very

15     happy that he was agreeing to put me down in the branch.

16     Q.   Your testimony is that Mr. Klinger agreed that he was

17     going to put you down on the first floor of the branch?

18     A.   Yes.

19     Q.   Did he have authority to do that?

20     A.   I would've assumed so.  He's in charge of our

21     territory and --

22     Q.   At a later date somehow that agreement was rescinded,

23     you're saying?

24     A.   It was, yes.  Yes.

25     Q.   Did you receive a performance review from

Kosakoski, Shirley

1    Mr. Klinger?

2    A.    Yes.

3    Q.    And you had monthly goals?

4    A.    Yes.

5    Q.    In 2010 you didn't meet those goals, right?

6    A.    Right.

7                              - - -

8              (Whereupon the document was marked, for

9        identification purposes, as Plaintiff's Exhibit

10       Number 15.)

11                             - - -

12   BY MR. LIEBERMAN:

13   Q.    Do you recognize this document?

14   A.    Yes, this is the one that Klinger and Ginder

15   presented to me in October, 2010, and it is almost

16   verbatim the same one that -- a few changes -- that

17   Shoemaker presented to me in 12 of '09.

18   Q.    Well, it talks about different months, right?

19   A.    Yes, it's supposed to be for a year, the calendar

20   year of 2010.  And this was the year of May, '08 to May,

21   '09.

22   Q.    This talks about March through January, right?

23   A.    Uh-huh.

24   Q.    Do you deny any of these numbers?

25   A.    (Reviewing document.)

Kosakoski, Shirley

243

1   Q.   I'm sorry, Mr. Klinger.

2   A.   He did.

3   Q.   What is an action plan?

4   A.   I'm sorry?

5   Q.   What is an action plan?

6   A.   What is an action plan?  It is a plan of action for

7   improvement.  It just outlines what they want you to do,

8   to improve.  And it's really designed to say, hey, if you

9   miss one of these steps, guess what, you didn't do what we

10  said you would do and therefore we're going to give you

11  further corrective action.

12             Again, the action plan was given to me

13  without any regard for my request for accommodations.  So

14  you know what was I -- I couldn't do anything but agree

15  with it.  You know, if I say I'm not going to do it

16  they'll say, well, you're not going to do it, you're

17  fired.  If I say, okay, I'm going to do it, I'll try best.

18  That's what I said, I'll try my best.

19                         - - -

20             (Whereupon the document was marked, for

21        identification purposes, as Plaintiff's Exhibit

22        Number 16.)

23                         - - -

24  BY MR. LIEBERMAN:

25  Q.   Do you recognize this document?

Kosakoski, Shirley

244

1   A.   (Reviewing document.)

2        Uh-huh.

3   Q.   Was that issued to you on December 29, 2010?

4   A.   Uh-huh.

5   Q.   Can you look at J?  Under J it says, "As per

6   Shirley's request, her branch circuit would be one branch,

7   the North Pointe branch office."  Was that one of your

8   accommodation requests, ma'am?

9   A.   It was half of one of my accommodation requests.  It

10  was --

11  Q.   You had three branches?

12  A.   I requested to have one branch and to be housed in

13  that branch.  So they gave the responsibility for the

14  branch but they would not house me in the branch.

15  Q.   But they did meet some of your requests regarding

16  that; is that right?

17  A.   They met some of one request, yes.

18  Q.   Now, this was sort of a guideline of what of you need

19  to do to succeed in the position; is that right?

20  A.   Uh-huh.

21  Q.   So they were trying to assist you and give you a plan

22  of action to be able to improve your performance; is that

23  right?

24            MS. SIEGLE:  Objection.  You can answer.

25            THE WITNESS:  They were trying -- they

Kosakoski, Shirley

245

1        were outlining what I had to do in order to avoid

2        further corrective action.

3   BY MR. LIEBERMAN:

4   Q.    Looking at PNC 197, which is the last page, it talks

5   about scheduling your week/calendar management.  Is that a

6   way to assist you in this process?

7   A.    It wasn't a way to assist me specifically, no.  This

8   was given to every BB in numerous meetings that we had,

9   this exact document.  And the expectation, PNC 197, 198

10  and 199, were all given to the all the BBs.

11  Q.    Eventually you were given a written corrective action

12  from Mr. Klinger; is that right?

13  A.    Yes, at some point I was.

14                        - - -

15              (Whereupon the document was marked, for

16              identification purposes, as Plaintiff's Exhibit

17              Number 17.)

18                        - - -

19  BY MR. LIEBERMAN:

20  Q.    Do you recognize this document?

21  A.    Yes.

22  Q.    And this is a written corrective action form?

23  A.    (Reviewing document.)

24              Yes.

25  Q.    Did you receive this on or about late May or June,

252

1  successful, I was trying to do my part.  I had asked for

2  assistance.  I had a lot of things going on and that

3  assistance wasn't forthcoming, and, yeah, I needed to take

4  time out.  I needed to take the PTO to attend to -- during

5  that time period my mother had been sick as well as my

6  brother, and I, you know, that was part of it.

7                        But, again, had I had the support that I

8  asked for -- it was very simple.  I asked from some very

9  basic support or change my position to something that's

10  open that I can do with a little more success, and I got

11  nowhere with it.

12  Q.  And did you leave the office for the day at 11:28?

13  A.  No, I did not.  Well, I might've left that office,

14  but I had other appointments that day.  I did not leave

15  work for the day.

16  Q.  Where did you go?

17  A.  To my recollection I believe it was Lititz, but I --

18  you know, I took lunch.  I know I took lunch right after

19  that, but I did not quit working for the day as he kind of

20  indicates here.

21  Q.  So when you called the ERIC line, that was in August

22  of '09.  And then after you came back -- and in September

23  of '09 you called regarding certain medical issues and

24  accommodations, and the bank assigned Lisa Whitacre to the

25  case; is that right?

Kosakoski, Shirley

1     A.    Right.

2     Q.    And did she meet with you?

3     A.    She did, yes.

4     Q.    Multiple times?

5     A.    I think twice we met in person.

6     Q.    That's when she discussed with you the FMLA

7     possibility --

8     A.    Yes.

9     Q.    -- initially?

10    A.    Initially when I called in August they recommended an

11    FMLA and I really didn't want any part of it.  I said, I

12    don't need FMLA, I just need some help in figuring out

13    what's going to work for me here.  But my health continued

14    to decline, and in September when I talked to her she

15    thought that would be a good idea to get my meds

16    straightened out and get some rest and recuperate first

17    and then come back to address if, and what, I needed for

18    accommodations.

19    Q.    Then Gail Dampman was assigned to investigate some of

20    the allegations of discrimination; is that correct?

21    A.    That was after my phone call, yes, in early 2010.

22    Q.    And then after your initial conversation with her you

23    wanted someone who was not from Sterling, correct?

24    A.    Well, I asked her because when I called the hotline,

25    which, again it just an 800 number and you get somebody

Kosakoski, Shirley

1    A.    That's what we were told, yes.

2    Q.    And then she says, "I then spoke with Shirley again

3    who had no further concerns that she wanted me to look

4    into because all the issues she was having involved Bob."

5    Do you recall telling her that?

6    A.    I don't recall saying those exact words.  What I

7    meant by that, other than what I had already given to her

8    there wasn't really anything else.  And at that point,

9    Lori Lockard said she was going to work with me on

10    accommodations, so I had --

11    Q.    So she's misquoting you?

12    A.    Well, I think at that point that was my primary

13    compliant was how Bob handled a number of things, and

14    since Bob had left...  But at that point I also had full

15    confidence that -- because I did ask her about the

16    accommodations and she told me she doesn't work on that

17    end, she only does the investigative part.  And that's

18    when Lori Lockard took over, so I just assumed that Lori

19    Lockard would be helpful.

20    Q.    She then writes, "I spoke with Bob's manager, Dennis

21    Ginder, who agreed to look into the corrective action, the

22    written warning, that Bob had originally written for

23    Shirley.  Dennis has agreed to rewrite the written warning

24    with accurate, up-to-date information.  The copy that Bob

25    drafted had incorrect dates and performance notes."  Were

1    you aware of that?  Is that accurate?

2    A.    That it was correct?

3    Q.    Yes.

4    A.    Yes.  Yes.

5    Q.    Were you aware that Dennis Ginder was going to

6    rewrite it?

7    A.    That's what she told me, yes.  And when was the date

8    of that, of those notes?

9    Q.    It's unclear.  "But Dennis did not promptly act on

10   the rewrite of the corrective action and during this delay

11   time Shirley received a bonus as an achieves employee."

12   Were you aware of that?  Is that true?

13   A.    I did receive a bonus, yes.

14   Q.    "Dennis called me stating that he had not had a

15   chance to work on the corrective action and he had since

16   hired a new manager for this department" -- that was

17   Mr. Klinger; is that right?

18   A.    Uh-huh.

19   Q.    -- "whom Shirley will now be reporting to."

20   A.    Uh-huh.

21              MS. SIEGLE:  Remember to say yes or no.

22              THE WITNESS:  Yes.

23   BY MR. LIEBERMAN:

24   Q.    "Dennis requested that we start with a clean slate

25   and not give Shirley any corrective action for performance

Kosakoski, Shirley

1    because too much time had lapsed."  Were you aware of

2    that?

3    A.    No one ever told me that at that time, no.

4    Q.    So with Ms. Barber, did you ever learn of the results

5    of her investigation?

6    A.    Only in discovery, this here.

7    Q.    She never told you she closed the case?

8    A.    No.

9                                 - - -

10                (Whereupon the document was marked, for

11            identification purposes, as Plaintiff's Exhibit

12            Number 20.)

13                                 - - -

14    BY MR. LIEBERMAN:

15    Q.    I'm showing you Exhibit Number 20, which is an email

16    from Robert Shoemaker dated December 1, 2009 about remote

17    access.  And that's essentially approving your remote

18    access; is that correct?

19    A.    Yes.

20    Q.    So after you came back from FMLA in November of '09,

21    mid-November, it was approved within three weeks; is that

22    right?

23    A.    It was approved, yes, on paper within three weeks.

24    Q.    It says, "Expect delivery of the CD within the next

25    five days."  Did you receive that CD?

258

1    A.    At some point I did, yes.

2    Q.    It says, "If you experience problems with the

3    software installation please contact the help desk."  You

4    contacted the help desk; is that right?

5    A.    Numerous times.  At first they sent me the wrong CD,

6    and then it was probably another month until I got the

7    right CD, and then it didn't work any way.

8                                - - -

9                (Whereupon the document was marked, for

10               identification purposes, as Plaintiff's Exhibit

11               Number 21.)

12                               - - -

13   BY MR. LIEBERMAN:

14   Q.    Here is an email that you sent to Mr. Shoemaker April

15   16, 2010, entitled technology issues.  Are these some of

16   issues that you were having?

17   A.    Yes.

18   Q.    Prior to April, 2010, had you been able to log on at

19   home using your laptop?

20   A.    Intermittently, but not reliably.

21   Q.    And IT worked on that issue; is that correct?

22   A.    They tried to.  I mean, they worked on it until July.

23   Q.    Do you recall when your request was granted for the

24   reduction of branches from three to two?

25   A.    Right in the beginning of my discussions with Lori

Kosakoski, Shirley

1    Lockard.

2    Q.   Which was when?

3    A.   I would estimate it to be maybe March of -- early

4    2010 sometime, February, March.

5                           - - -

6                (Whereupon the document was marked, for

7            identification purposes, as Plaintiff's Exhibit

8            Number 22.)

9                           - - -

10   BY MR. LIEBERMAN:

11   Q.   Do you recognize this document?

12   A.   Uh-huh, yes.

13   Q.   This was a draft dated March 18, 2010, that

14   Mr. Shoemaker sent to you and you confirmed no changes to

15   the draft; is that right?  That's your email

16   skos461@comcast.net?

17   A.   Yes.

18   Q.   So you're agreeing with the change that you would now

19   have just two branches to support?

20   A.   Well, I was agreeing it was a start.

21   Q.   And eventually --

22   A.   I mean, it was a start down the road.

23   Q.   Eventually in December of '09, they reduced you down

24   to one branch; is that right?

25   A.   Yeah, I was hopeful they would continue to reduce it.

260

1                   MS. SIEGLE:  2009 or 2010?

2                   MR. LIEBERMAN:  2010.  In December of

3       2010.

4       BY MR. LIEBERMAN:

5       Q.   Now, at a certain point Ms. Lockard dealt with you in

6       terms of the accommodations and had a number of

7       conversations with you about those, right?

8       A.   Yes.

9       Q.   How many conversations did she have with you?

10      A.   I would say several each month, this whole time from

11      the time I requested them until -- until the time I had

12      the final written warning.

13      Q.   Several?

14      A.   Several in a -- several each and every month.  Some

15      months --

16      Q.   So it's fair to say that she was trying to work with

17      you in findings these qualifications?

18                   MS. SIEGLE:  Objection.  You can answer.

19                   THE WITNESS:  No, it's not.  I would say

20        typically I would call her and ask where we stood or

21        if something wasn't done that was promised, and I

22        would say what's going on or...

23      BY MR. LIEBERMAN:

24      Q.   At a certain point she asked for some medical

25      documentation to support your accommodations; is that

                         Kosakoski, Shirley

1    right?

2    A.   Yes, which I had given her in February and in March,

3    in the time period of February and March, 2010.

4                              - - -

5                    (Whereupon the document was marked, for

6             identification purposes, as Plaintiff's Exhibit

7             Number 23.)

8                              - - -

9    BY MR. LIEBERMAN:

10   Q.   Now, this is a form in February, 2010.  It's a letter

11   asking your health care provider to complete to assist her

12   regarding her accommodations --

13   A.   Yes.

14   Q.   -- of job performance?

15   A.   Yes.

16   Q.   This is shrunk a little bit so let me see if I have

17   another copy somewhere else.

18                              - - -

19                    (Whereupon the document was marked, for

20            identification purposes, as Plaintiff's Exhibit

21            Number 24.)

22                              - - -

23   BY MR. LIEBERMAN:

24   Q.   So you said that you were provided some medical

25   documentation requested by the bank.  Looking at Exhibit

1    24. looking at the last two pages.  This was completed by

2    Joseph Kosakoski?

3    A.   Yes.

4    Q.   He's your primary physician?

5    A.   He is.

6    Q.   Are there any accommodations that are listed here?

7    A.   I believe so.  Number 3, mitigating measures.

8    Q.   What are the mitigation measures?

9    A.   Well, it says accommodations will be forthcoming from

10   the neuropsychologist.  And in number 5 it says with

11   reference to my job description the limitations on my

12   abilities.

13   Q.   Those are your limitations, but what specific

14   accommodations are under number 5?  It says, "Please

15   provide us with recommendations of possible

16   accommodations."

17   A.   Right.  Well, he referred that to the neuropsych

18   specialist and the job coach that I had seen as well,

19   Casey Dixon.

20   Q.   So Dr. Kosakoski, who is also your brother-in-law,

21   didn't recommend any accommodations?

22   A.   Well --

23             MS. SIEGLE:  Objection.  You can answer.

24             THE WITNESS:  Yes, he said accommodations

25    in the workplace at the point of performance," that

Kosakoski, Shirley

263

1       "accommodations will be forthcoming," and that he

2       concurred with what the two experts in number 5

3       recommended.

4    BY MR. LIEBERMAN:

5       Q.    So you're saying Dr. Kosakoski reviewed -- it says

6       "forthcoming."  Did he review those?

7       A.    He did.  Not for this document, but he did when he

8       got them.

9       Q.    After you gave this form to the bank, then you went

10      to Dr. Cynthia Socha-Gelgot?

11      A.    Socha-Gelgot, yes.

12      Q.    What did you first meet Dr. Socha-Gelgot?

13      A.    I believe it was in late January, early February of

14      2010.

15      Q.    How many times did you meet with her?

16      A.    Twice.

17      Q.    Who referred her to you?

18      A.    Dr. Kosakoski.

19      Q.    Do you recall when you met with her?

20      A.    Yeah, as I said, it was, I think, late January, 2010.

21      Q.    What did you do at the first appointment?

22      A.    We discussed why I was there, and we did some --

23      actually, I think I met with her three times.  The first

24      time was a consult.  And then the next time we had a full

25      day of neuropsych testing, just to determine on the off

Kosakoski, Shirley

266

1    world is not to have administrative assistants.  So I

2    understand that financially it's not in the budget, which

3    is why I said if you can do it, great, it's an

4    accommodation and I'm asking you do to it.  If you can't,

5    then I'd like to be reassigned.  Because that's really --

6    that and the having multiple offices in the multiple

7    locations were the two biggest obstacles for me.

8    Q.   At any point in time did Ms. Lockard ask you what

9    specifically an administrative assistant would do for you

10   and help you perform the essential functions of your job?

11   A.   Down the road in a conversation we had in August she

12   said I never told her what I needed.  I said, I thought I

13   did.  Here are the things that I need.  And she said,

14   well, you need to tell me exactly what you want an admin

15   to do.  And I said, well, exactly, I want her to do the

16   things that an admin does.  I want her to do filing and

17   reports and keeping the calendars and schedule -- you

18   know, anything that an admin does, paperwork, clerical

19   things.

20   Q.   So the jobs you applied for, you wouldn't have to do

21   any of your own filing?

22   A.   The jobs I applied for all had an administrative

23   assistant.

24   Q.   You could just do any job that had an administrative

25   assistant and your ADD would be not a factor?

Kosakoski, Shirley

1    Q.   Another referral to Robert Skacel, Ph.D.

2    A.   I did not go to him because he was affiliated with

3    some of the Sterling management and also with Laura

4    Schanz, who was the customer that I had the ethical issues

5    with on the loan, so I didn't feel it was appropriate to

6    go to him.

7    Q.   Then in number 5 she talks about workplace

8    accommodations.  Let's talk about number one.  She says,

9    "Allowing her to work in a local branch only.  (Shifting

10   gears between multiple branches is overload for the

11   brain's frontal system.)"  Is that right?

12   A.   Yes.

13   Q.   And PNC allowed you to work in one branch; is that

14   right?

15   A.   I had two offices.  I couldn't work just -- no, it

16   wasn't.  I mean, I was supporting the needs of that branch

17   from a different office.

18   Q.   But she says, "shifting gears between multiple

19   branches is overload for the brain's frontal system."  She

20   is saying that you should not be having to switch between

21   branches; is that right?

22   A.   Well, she is saying that.  And, in fact, yes, you're

23   right, they finally did that, but it was just as they were

24   preparing to put me on a final written warning.  So it was

25   too little too late in that instance.

Kosakoski, Shirley

1   is not able to accommodate her disability, then she should

2   consider asking her employer to place her in a job role

3   that she's able to perform."

4   A.   Which is exactly what I did.

5   Q.   And that's "commercial banker with health care

6   specialty"?

7   A.   Well, she added those because that was my prior role

8   that I was successful in just as an example of something.

9   Q.   Now, this particular doctor, Dr. Socha-Gelgot, was

10  only dealing with your ADHD; is that right?

11  A.   Right, which was the primary affliction that I needed

12  the accommodations for.

13  Q.   Now, after you give this to Ms. Lockard -- you said

14  there were several conversations each month discussing

15  these qualifications; is that right?

16  A.   Well, not discussing them but asking where we were

17  at, asking what the status was, yes.

18  Q.   But she discussed them with you?

19  A.   She -- I'm not sure if she discussed them with me;

20  she let me talk, she argued.

21  Q.   Now, the other positions that you applied for -- or

22  wanted to be assigned to, you're claiming these would be

23  accommodations because they all had administrative

24  assistants; is that right?

25  A.   Yes.

```
 1                          -  -  -
 2                 (Whereupon the document was marked, for
 3             identification purposes, as Plaintiff's Exhibit
 4             Number 26.)
 5                          -  -  -
 6      BY MR. LIEBERMAN:
 7      Q.    I'm showing you exhibit number 26.   Do you recognize
 8      this document?
 9      A.    Yes.
10      Q.    This is your resume, right?
11      A.    Yes.
12      Q.    The third page of this is an email, April 19, 2010,
13      to Carole Yon regarding the business adviser position in
14      Lancaster, correct?
15      A.    Yes.
16      Q.    And there is your application, internal application,
17      following that?
18      A.    Uh-huh.
19      Q.    Do you realize that this was a senior business
20      adviser position?
21      A.    I don't -- I didn't realize specifically what it was.
22      I was told by someone in that department that it was
23      opening up and they said you'd be a good fit, why don't
24      you apply.   So I did.
25                          -  -  -
```

Kosakoski, Shirley

274

1           (Whereupon the document was marked, for

2              identification purposes, as Plaintiff's Exhibit

3              Number 27.)

4                              - - -

5     BY MR. LIEBERMAN:

6     Q.    I'm showing you the application of Mr. Robert Walter.

7     Looking at PNC 1163, do you see that Mr. Walter worked for

8     the Wilmington Trust Company in private banking and wealth

9     management from July, 2007, to January, 2010?

10    A.    Uh-huh, yes.

11    Q.    Did you have any experience working in private

12    banking and wealth management?

13    A.    No.

14    Q.    His job prior to that was with Susquehanna Bank from

15    March of 2004, to July of 2007.  He worked in private

16    banking, wealth management, business development.  He was

17    the vice president and manager of private banking.  You

18    had no experience at all in private banking?

19    A.    Was that a question?

20    Q.    Yes.

21    A.    No.

22    Q.    But you still claim that you were more qualified than

23    Mr. Walter?

24    A.    According to?

25    Q.    I'm asking you.  Do you still claim that you were

Kosakoski, Shirley

277

1    correct?

2    A.    She told me to go through the posting process.  She

3    didn't say initially that I had to then interview as an

4    outsider.  She didn't tell me that until later.

5    Q.    And the posting process is you post --

6    A.    You post your resume --

7    Q.    -- your resume and your application?

8    A.    Yes.

9    Q.    And the second part of that process would be an

10    interview?

11    A.    That wasn't -- she didn't disclose that to me until

12    after I posted.  Because, again, when I posted I assumed,

13    okay, that's just a step -- red tape that you to go

14    through.  Then she said, oh, now you have to interview.

15    Q.    In 2008 when you posted for the treasury management

16    position, did you post an application?

17    A.    That was a whole different scenario.

18    Q.    I'm asking you, in 2008 did you post for that

19    position?

20    A.    I did post for that position, yes.

21    Q.    And then you interviewed for that position?

22    A.    I did.

23    Q.    Why would this be any different?

24    A.    Because that wasn't a request.  This is a request for

25    reassignment as an accommodation.

281

1    laptop was functioning appropriately.

2    A.    Finally in July of 2010, it was fixed and

3    functioning, seven and a half months after I needed it to

4    be functioning.

5    Q.    "In addition, our IT department has worked with you

6    to try to provide you with access from your home

7    computer."  Is that true?

8    A.    They worked with me.  They did what they could, but

9    they didn't have clearance from HR to do what I was

10   requesting.

11   Q.    Then it says, "If your current remote access is not

12   sufficient, you will need to supply documentation from

13   your medical provider explaining what remote access you

14   require based on your medical condition and that your

15   current access is insufficient."  Did you provide any such

16   medical documentation?

17   A.    I provided it back in March of 2010, eight months

18   prior to this email.

19   Q.    Subsequent to the email, did you provide any

20   additional medical documentation?

21   A.    No, because this is the first time she asked me for

22   additional medical documentation regarding the remote

23   access.  And I would further state that every other

24   business banker in the company had exactly what she's

25   stating in number one.

Kosakoski, Shirley

1    Q.   So between November, 2010, until your resignation

2    date, you didn't provide any additional medical

3    documentation; is that right?

4    A.   No.

5    Q.   In number 2 she says, "You requested to be placed in

6    an office on the first floor in the building where you

7    currently work."  Is that correct?

8    A.   That was what Klinger recommended and said was going

9    to be done, and I agreed that that would be helpful.

10   Q.   Then it says, "However, you have not provided medical

11   documentation indicating that you are unable to work from

12   an office upstairs."

13   A.   Again, no one ever asked me for medical documentation

14   on that.

15   Q.   After you got this did you provide any medical

16   documentation to support that?

17   A.   No, I referred her back to the original

18   documentation.

19   Q.   Doctor --

20   A.   The neuropsychologist.

21   Q.   She doesn't mention anything about working on the

22   first floor.

23   A.   Well, it's not specific to -- it's not the location

24   of the floor, it's the location of being in the workspace

25   where my work is being done and not having to go to a

Kosakoski, Shirley

1    different workspace.

2    Q.   And then she says, "As we have discussed, you may

3    continue to use the first floor office when available."

4    Is that true?

5    A.   As could everyone.  That was not an accommodation.

6    Anyone could --

7    Q.   But you could use the first floor?

8    A.   Everyone could use the first floor.

9    Q.   Ma'am, we --

10   A.   Everyone including me.

11   Q.   We could be here all day.

12   A.   I know.  Everyone includes me, so --

13   Q.   Were you allowed to use the first floor?

14   A.   Yes, I was allowed.  I was not banned from the first

15   floor.

16   Q.   "If you contend that you need an office on the first

17   floor based on your medical condition, please have your

18   health care provider provide an explanation of why a first

19   floor office is medically necessary and why working on the

20   second floor prevents you from being able to perform the

21   essential functions of your job."  Did you provide any

22   medical documentation to support that?

23   A.   I did in March of 2010.

24   Q.   Subsequent to November of 2010, did you --

25   A.   No.

Kosakoski, Shirley

284

1    Q.   -- provide any medical documentation?

2    A.   No.

3    Q.   It says, "You requested an administrative assistant.

4    Despite numerous requests you have not identified the

5    specific functions for which you require assistance.  If

6    you continue to contend that you require an administrative

7    assistant, please have your health care provider provide

8    documentation regarding the specific job duties for which

9    you require assistance and explaining why your condition

10   prevents you from being able to perform these duties."

11   Did you provide any medical documentation Subsequent to

12   November 9, 2010, to support your request for an

13   administrative assistant?

14   A.   No, but I did identify to her the functions that I

15   needed.

16   Q.   And those were what?

17   A.   Clerical functions.  Again, as I stated earlier,

18   filing paper, reports, data entry, printing, clerical work

19   in general.

20   Q.   Then it says, "You also raised concerns about

21   participating in reviewing open positions and going

22   through the posting process.  As we have indicated, we are

23   trying to work with you in your current position but you

24   are also being permitted to post for other available

25   positions for which you may be qualified.  Our practice is

Kosakoski, Shirley

1    to actively work together with employees to determine

2    interests and assess skills and qualifications based on

3    the particular openings available."  Do you feel the bank

4    was doing that?

5    A.   They were permitting me to post, yes.  I don't feel

6    they were trying to work with me in my current position.

7    Q.   At the end it says, "However, if you believe that we

8    cannot accommodate you in your current position, we will

9    need supporting medical documentation indicating the

10   reasons why a transfer to another position is medically

11   necessary."  And you didn't provide any further medical

12   documentation other than what you had provided earlier; is

13   that right?

14   A.   I didn't provide anything further, no.

15                           - - -

16              (Whereupon the document was marked, for

17          identification purposes, as Plaintiff's Exhibit

18          Number 31.)

19                           - - -

20   BY MR. LIEBERMAN:

21   Q.   I'm showing you some documents regarding an

22   investigation conducted by Fran Lewis.  This, I believe,

23   is the woman who spoke with you?

24   A.   Yes.

25   Q.   And I want to turn to the last page of that document

1   to start with.  So it seems like in August of 2010, the

2   last three pages, DeeAnn Carpenter, the branch manager,

3   brought the issue to Ms. Lewis' attention.

4   A.   Yes, it appears that way.

5   Q.   There is essentially an email to you, July 30, 2010,

6   outlining her concerns; is that right?  Under PNC 611?

7   A.   (Reviewing document.)

8        Dee emailed 7/30 saying, yes, this customer was

9   in.  They don't include my response to her.  These were

10  service issues, and I did talk to the customer about them

11  and I referred her to the service center, which Dee

12  doesn't talk about here.

13  Q.   And ultimately there was no discipline as you

14  testified to earlier?

15  A.   Correct.

16  Q.   Is there anything in these documents that

17  demonstrates that the audit department investigated you?

18  A.   No.  Andy Klinger told me that it was an audit issue,

19  that they were randomly pulling accounts to investigate.

20  Q.   But there is nothing in here to suggest that there

21  was an audit issue?

22  A.   No, but I haven't seen these before, so I went by

23  what Mr. Klinger told me.

24  Q.   You never spoke to anyone besides Fran Lewis as part

25  of that?

Kosakoski, Shirley

287

1    A.    In regards to this?  No.

2    Q.    Why do you believe this is a retaliation because of

3    your age, disability or gender?

4    A.    Because I believe Andy Klinger directed Dee to make

5    this call.

6    Q.    You have no facts to support that, right?

7    A.    Well, he would have been copied on this, as a matter

8    of procedure at PNC.  And so he knew that she made the

9    call and he vehemently denied to me that she had anything

10   to do with it.  He told me it was an audit thing.

11                               -  -  -

12              (Whereupon the document was marked, for

13          identification purposes, as Plaintiff's Exhibit

14          Number 32.)

15                               -  -  -

16   BY MR. LIEBERMAN:

17   Q.    Do you recognize this document?

18   A.    Yes.

19   Q.    Is this something that you typed up?

20   A.    It was cut and pasted from PNC policy, and I added

21   some comments, which were in red but obviously that didn't

22   transfer over when it's copied.

23   Q.    What parts were cut and pasted from PNC policy?

24   A.    Everything except the third bullet point, "Did not do

25   this step (offered, but not implemented.)"

Kosakoski, Shirley

1    Q.    So step one talks about the verbal warning/counseling

2    process?

3    A.    Yes.  And then, in fact, the second paragraph from

4    the bottom where it says, "I did this and was promised

5    admin support, which never came; also told to work out

6    accommodations with HR and HR told me to work with my

7    supervisor."

8    Q.    And then the next paragraph is what you wrote?

9    A.    And then going onto the next paragraph, yes.  Then

10   the last sentence is policy.

11                        - - -

12            (Whereupon the document was marked, for

13         identification purposes, as Plaintiff's Exhibit

14         Number 33.)

15                        - - -

16   BY MR. LIEBERMAN:

17   Q.    So this is an April 2, 2010, job reassignment

18   request.

19   A.    Yes.

20   Q.    This a follow-up on a request to reassign you to an

21   open position, which you claim you were highly qualified

22   for, the business adviser in the Wealth Management Group?

23   A.    Yes.

24   Q.    And you had already spoken to Shane Zimmerman about

25   it?

Kosakoski, Shirley

289

1    A.    Yes.

2                              - - -

3              (Whereupon the document was marked, for

4         identification purposes, as Plaintiff's Exhibit

5         Number 34.)

6                              - - -

7    BY MR. LIEBERMAN:

8    Q.    Do you recognize this document?

9    A.    Yes, they're my notes.

10   Q.    When did you take these notes?

11   A.    Sometime after June of 2010.

12   Q.    Looking at number 10 it lists Lori Lockard.  It says,

13   "handling accommodation requests."  Is that true, she was

14   responsible for that?

15   A.    She was responsible, yes.

16   Q.    "Would not transfer."  She told you that the bank

17   would not transfer you, is that right --

18   A.    She told me that --

19   Q.    -- that you needed to post for positions?

20   A.    Yes.

21   Q.    She told you that multiple times, right?

22   A.    She did several times.

23   Q.    Looking at number 13, it says, "When Bob Shoemaker

24   announced his resignation and Klinger was appointed" --

25   is that right?

Kosakoski, Shirley

294

1   A.   I don't recall exactly how many times.   It was a

2   number of times over a number of months.

3   Q.   While you were employed with PNC?

4   A.   Yes.

5                              - - -

6            (Whereupon the document was marked, for

7        identification purposes, as Plaintiff's Exhibit

8        Number 37.)

9                              - - -

10   BY MR. LIEBERMAN:

11   Q.   I'm looking at some notes we received from the office

12   of Ms. Dixon.   Do you recall meeting with her in October,

13   2010?

14   A.   Yes.

15   Q.   And then there are some notes from session number

16   seven, June 4, 2010.

17   A.   (Reviewing document.)

18        Yes.

19   Q.   On the last page it says, "Targeted: FML,

20   troublemaker."   Why do you feel like you were targeted as

21   a troublemaker?   Because you took FMLA level?

22   A.   After I came back from FML and I requested the

23   accommodations everything got more difficult.   And so,

24   yeah, I think I was targeted as a troublemaker.   It was --

25   I had the sense that, oh, here we go again, it's Shirley.

Kosakoski, Shirley

1              And rather than working with me -- I was

2     trying to do my best, as it shows you here.  I paid out of

3     pocket for these sessions.  I paid out of pocket for

4     Socha-Gelgot.  I think it was thousands of dollars I was

5     paying out of pocket to try to make myself better, to try

6     to do what I could do, and to try to be clearer about what

7     I needed, and I still met with resistance.

8                              - - -

9              (Whereupon the document was marked, for

10             identification purposes, as Plaintiff's Exhibit

11             Number 38.)

12                             - - -

13    BY MR. LIEBERMAN:

14    Q.   What I'm showing you, is that another coaching

15    session from Ms. Dixon?

16    A.   Yes.

17    Q.   If you want to look at last page, on bottom it says,

18    "lots of losses and trauma.  Seeing a behavioral

19    therapist."  Do you know what was being referring to

20    there, the losses and trauma?

21    A.   I'm not sure what she was referring to other than --

22    let's see when this was.  Yeah, I probably mentioned that

23    the year before was just a tough year.

24    Q.   Before that it says, "No job equity.  She has more

25    clients and branches than she can handle."  And the bank

                     Kosakoski, Shirley

296

1 eliminated two of your branches, right?

2 A. Not at this point, no.

3 Q. But ultimately they did.  First they went down from

4 three to two, and then they went down from two to one; is

5 that right?

6 A. Ultimately, yes.

7 Q. Then it says, "Home access for tech: almost there."

8 A. At that point we thought we were almost there.

9            - - -

10     (Whereupon the document was marked, for

11      identification purposes, as Plaintiff's Exhibit

12      Number 39.)

13           - - -

14 BY MR. LIEBERMAN:

15 Q. I'm showing you Exhibit Number 39.  This is an

16 evaluation, March 30, 2009, from Mr. Marinucci.  Do you

17 recall meeting with Mr. Marinucci?

18 A. Uh-huh, yes.

19 Q. Did you tell him that at the time that you were

20 having some difficulties with sleep?

21 A. Yes.

22 Q. Did you tell him that you "reported that you were the

23 victim of abuse as a child"?

24 A. Yes.

25 Q. Did you tell him that you "reported having job

**April 2007**

Recruited to Bank of Lancaster County (BLC) as a Middle Market Relationship Manager.

Commercial Lender specializing in Continuing Care Retirement Communities, Nursing Facilities, and non-profit medical and social services entities with large and complex borrowing needs. Clients have revenues between $5MM and $50MM annually.

Salary: $92,500

Signing Bonus: $10,000

Target Client Portfolio:  15 – 30 primary relationships;  approx. $150MM loan outstandings.


**May 2007**

– Start new job with Bank of Lancaster County as a Middle Market Lender concentrating on a portfolio of CCRC's and non-profits. Average portfolio is 30 – 40 clients and an administrative assistant supports me and one other MM Lender.

A week later a company-wide meeting is called to reveal that the Bank and its holding company are in dire financial condition due to a fraud at an affiliate EFI. The following weeks and months reveal more losses and finally the bank is forced to sell, and PNC is the buyer.  For the next year we are engaged in damage control and retaining as many customers as possible .  I retained 95% of my clients.

My admin transfers to another position in the bank…….Jodi is now assigned to me.

Jodi leaves the bank in late summer.

Connie is chosen to be new admin supporting myself and Kristi Beam.

Summer 2008 – Connie posts for another position due to elimination of her role in the future. Connie accepts position in another department.



EXHIBIT
P-1
11-28-12 AP

**Job Assignments at PNC for Sterling Business/Commercial Employees – Summer 2008**

The commercial and business banking employees at Bank of Lancaster County were notified that sales positions were not being eliminated, however some employees would see changes in their roles as PNC had a different structure to these postions.

I initiated a meeting with Bob Shoemaker to discuss what roles were available and for which I would be considered.  He was the department head and was part of the decision-making team for job assignments in the transition to PNC from Bank of Lancaster County.

At that time -- late Spring/early Summer 2008 - I very clearly expressed to Bob my desire to *NOT* be assigned the  Business Banker role. Having recently been in a management role similar to Bob's at a (PNC) peer bank with an almost identical Business Banker role, I knew very specifically what the major requirements of the job entailed and knew this would be a struggle for me.

I am well aware of my strengths and competencies and knew from prior experience that this role would not be a fit for my skills, work style, or my challenges with ADD and related medical conditions.  I did not reveal the ADD or medical issues at the time, because I was confident from our conversation and the subsequent conversation with Tom Sposito that it would not be necessary to reveal this in order to achieve a good fit for both myself and the bank.

Bob noted my request and additionally sent me to speak with Tom Sposito, who was very persuasive in his approach.....he addressed me as though he was persuading me not to leave the bank.  Tom also noted my request along with discussing my background and then he said .

48

that even though the final assignments had not yet been decided, he strongly advised me to stay in whatever role I was asked.  He said that even if I was assigned to something other than my first or second preference it would only be temporary and he used the analogy of a "bridge to the other side" , meaning I should look at it as transitional and as a way to get through the merger and conversion, help out the team, and when the dust settled, I would likely have my pick of many fitting positions that would be available at PNC.  He assured me that within a six months to a year of conversion (8/8/08) I could move on to something else.

I felt confident that Bob and Tom valued my knowledge, professional self-awareness, experience and assessment of skill sets required by various positions and that I brought to the job.

In the end, I was assigned to the Business Banker role and Bob asked me to just be a team player and said he viewed it as a way for me to help him, and for me to be a leader among my peers.  He asked and I agreed to "take one for the team", having been assured that my cooperation would not go unnoticed or unrewarded.

Here is how the past 19 months have played out:

August – December 2008 -   typical conversion/merger  - lots of hard work, but everyone in the same boat and helping each other.

Q1 2009 – Sales ramp up begins......

In my new role, I have no existing customers, compared to the other BB3's who have been with the bank for many years and have large portfolios of existing customers and repeat business. They are also well-entrenched in their territories which they have had for many years, and are well known by customers, branch employees and the communities in general.

Shirley -  inherited the business customers of a retired BLC banker.  The portfolio is overwhelmed with service issues, problems and errors.   The administrative assistant who is assigned to me has not been doing her job and when I finally asked her about this she blatantly refused to do even the smallest tasks for me because she is losing her job on March 31 2009. She tells Bob she is working hard and he only realizes after she leaves that she had let things go.  (She was also the assistant to the man who retired, so she had no connection to me and did not care).

The retired banker has been meeting with his old clients (my new customers) and telling them how bad PNC is and why they should not bank here.  He even takes on a paid consultant role for one of my biggest customers, who has since left the bank – after I spent countless hours trying to service the relationship and save it.

I am asked to do "warm hand-offs" of my prior accounts from Bank of Lancaster to Business Advisors and Corporate Bankers. These are complex relationships which required meetings and for which I was still involved in the credit facility renewals through the end of September 2009.

# PNC BANK CORP.
# JOB PROFILE

For HR coding purposes ONLY
FLSA Non-Exempt:
FLSA Exempt: X
EEO Category: 2
EEO Group: E
Census Code: 012
Number: C07814
Grade: 20

**Job Title:** Business Banker III
**Date:** 11/01/2005
**LOB:** Consumer Banking
**Segment:** Business Banking
**Function Code:**

## *Position Overview*

*a. State the job's primary purpose (why the job exists):*

Responsible for maximizing the return on an existing Book of Business of Small Business Bank customers and prospecting for new Small Business opportunities 80% of the time. Drives sales revenues and customer satisfaction equating to increased retention and Business Bank achieving its goals and objectives. Sells all PNC Bank products and services at a service level which differentiates PNC in the market place, allowing PNC Bank to compete at an advantage and profitability grow market share. Acts as a mentor to the Business Banker I and Business Banker II, while maintaining a book of business with more complex relationships.

*b. Briefly describe the kind of work performed in the unit:*

*c. Complete an Organizational Chart for the unit showing the number of FTE's supervised, their functional titles, and status (FT or PT). If additional pages are needed, please make a copy and complete as required. If you have a comparable Organization Chart already prepared in MS-Word, MS-Excel or some similar package, please attach a copy by clicking on the "BROWSE" button below.*
*aaa*

## *Essential Functions - Critical Elements of the Job*

This section is used to identify the critical elements or major functions and responsibilities of the job holder. If the **primary** purpose is the management or direct supervision of a unit, complete the first essential function, then proceed to the second. Otherwise, go to the second essential function. Be sure to indicate the percent of time spent performing each function in an average workweek.

| % Time Performed (Example: 5%, 25%, 100%) | | |
|---|---|---|
| **I. Does the incumbent have the authority to:** | | |
| No | (A) | assign and direct work |



**CONFIDENTIAL**

**PNC 730**

| No | (B) | institute or recommend corrective |
|---|---|---|
| No | (C) | action/discipline/discharge |
| No | (D) | recommend salary increases |
| No | (E) | conduct annual performance evaluations |
| No | (F) | recommend promotions |
| No | (G) | interview and select staff |
| No | (H) | set or recommend new hire rates of pay/hours of work |
| No | (I) | train employees |
| No | (J) | research and resolve subordinate complaints/grievances |
| No | (K) | plan the work operation |
|  |  | determine the means, methods and materials for performing work |

**Comments:**


**II. List the remaining Essential Functions/Responsibilities (typically no more than 5-7) in order of importance, including how each is accomplished and why. The "why" includes the outcome or results produced.**
**% Time Performed: (Example: 5%, 25%, 100%)**
Essential Function #1:
Develops and utilizes a formal calling plan to target new Small Business Bank prospects for establishment of new bank relationships. Acts as a consultant/advisor to targeted prospects. Less reliance on branch for referral sources; reliance on relationships that have been developed with external referral sources (i.e., accountants, attorneys, etc.) Outside prospecting will equate to 90% of the job.
How is it accomplished?

Why is it done? What are the outcomes?


**% Time Performed: (Example: 5%, 25%, 100%)**
Essential Function #2:
Develops and grows a portfolio of existing Small Business Bank Clients (book of business) by selling a full range of PNC Bank products and services in a highly consultative, needs based manner. Develops and utilizes a formal calling plan to cross sell opportunities to existing book of business. The book of business is made of more complicated/complex customers. Growing the book of business will equate to 20% of the time.
How is it accomplished?

Why is it done? What are the outcomes?


**% Time Performed: (Example: 5%, 25%, 100%)**

CONFIDENTIAL

Essential Function #3:
Determine appropriate loan terms and conditions, which are acceptable to the customer and in line with credit policy. This involves a strong working knowledge of financial statement analysis.
How is it accomplished?

Why is it done? What are the outcomes?

% Time Performed: (Example: 5%, 25%, 100%)
Essential Function #4:
Schedules sales calls on customers and prospects. Because of this relationship driven approach, calls must be very targeted and consultative in nature. This involves knowing the industry of the customer and prospects, understanding cash flow and revenue sources.
How is it accomplished?

Why is it done? What are the outcomes?

% Time Performed: (Example: 5%, 25%, 100%)
Essential Function #5:
Active participation and membership in dominant community activity(ies) as a way to develop networking contacts and relationships.
How is it accomplished?

Why is it done? What are the outcomes?

% Time Performed: (Example: 5%, 25%, 100%)
Essential Function #6:
As part of an active business development program, is cognizant of LMI opportunities.
How is it accomplished?

Why is it done? What are the outcomes?

% Time Performed: (Example: 5%, 25%, 100%)
Essential Function #7:

How is it accomplished?

Why is it done? What are the outcomes?

## *Education, Training, and Experience*

CONFIDENTIAL

Indicate the _minimum_ education requirements, including any specialized course work _and_ how this requirement will be applied on the job:

_Level_
Bachelor

_Major_
Preferred Bachelor's Degree in Business, Finance or Accounting

_Indicate why the degree, course work, and/or licenses or certifications are required. (How will it be applied?)_

_Indicate any necessary specialized training, courses, or subjects that may not be available in a high school or college curriculum:_

_Indicate required professional licenses or certifications:_

## Experience
_Considering the Essential Functions/Responsibilities described, what is the **minimum** amount of time and related work experience necessary to satisfactorily perform this job? (e.g., at least 2 years financial analysis, at least 4 years lending experience to Middle Market customers, etc.)_
5 plus years in a Small Business relationship management or sales role.
_Would you consider a level of experience in lieu of education?_

_If Yes, please explain._

## Skills And Abilities
_Indicate specific skills and competencies required to perform the job._
· Financial sales and lending abilities
· Ability to work in a revenue-based, incentive-driven environment.
· Demonstrated consultative sales skills.
· Self starter, works independently
· Goal Oriented
· Highly organized, multi task, follow-up skills
· Clear communications
· Strong credit skills (proven experience with credits of $250,000)
· Leadership

## Position Scope

| (Complete all that apply) | Direct Responsibility | Shared Responsibility or Significant Influence |
|---|---|---|
| Budget Managed | $ | $ |
| FTE's Managed | | |

CONFIDENTIAL

| Expenses | | |
|---|---|---|
| Fee/Revenue Goals | $ | $ |
| Loan Portfolio Assets | $$>250K (with the potential to go to $1MM) | $ |
| No. Of Accounts/Customers | 100 PCP (Preferred Customer Portfolio)-more complicated complex type customer, with the ability to go up to $5.0M revenue size companies. | |
| Investment Portfolio Assets | $ | $ |

Other: · Ability to take industry knowledge, accounting knowledge (income statement, balance sheet, etc.) and PNC product knowledge and turn all of that into revenue, retention and customer satisfaction.
· Excellent written and verbal presentation skills.
· Must be able to interact with all levels of PNC Management as well as various management levels within customers and prospects business.
· Development and management of a broad-based portfolio within the assigned marketplace directly impacts the overall profitability of the Business Bank and the RCB.
· Fast paced.
· Some travel required
· Active participation and membership in dominant community activity(ies)
. This will require evening meetings.

CONFIDENTIAL

PNC 734

To:          Carlton Klinger
             PNC Bank

Date:        July 8, 2011


This memo constitutes my two weeks notice and resignation from PNC Bank.


*Shirley T Kosakoski*

Shirley T. Kosakoski
PH72473

EXHIBIT

P-5

11-28-12 AP

PENGAD 800-631-6989

| CHARGE OF DISCRIMINATION | | AGENCY | CHARGE NUMBER |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | | ⌐ FEPA<br>⌐ EEOC | *530 2010-02525* |

| Pennsylvania Human Relations Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| NAME *(Indicate Mr., Ms., Mrs.)*<br>Ms. Shirley Kosakoski | | HOME TELEPHONE *(Include Area Code)*<br>717-464-1161 | |
|---|---|---|---|
| STREET ADDRESS<br>102 Crosscreek Lane | CITY, STATE AND ZIP CODE<br>Lancaster, PA 17602 | | DATE OF BIRTH<br>4/4/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME<br>PNC Bank | NUMBER OF EMPLOYEES, MEMBERS<br>100+ | TELEPHONE *(Include Area Code)*<br>412-762-2000 | |
|---|---|---|---|
| STREET ADDRESS<br>101 North Pointe Blvd. | CITY, STATE AND ZIP CODE<br>Lancaster, PA 17601 | | COUNTY<br>Lancaster |

| NAME<br>PNC Bank | TELEPHONE NUMBER *(Include Area Code)* | |
|---|---|---|
| STREET ADDRESS<br>5th Avenue & Wood Street | CITY, STATE AND ZIP CODE<br>Pittsburgh, PA 15222 | COUNTY<br>Allegheny |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box (es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| RACE    COLOR    xx SEX    RELIGION    NATIONAL ORIGIN<br><br>xx AGE    xx DISABILITY    RETALIATION    OTHER | Earliest                    Latest<br>          CONTINUING ACTION |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

Please see attached.

RECEIVED – EEOC
PHILADELPHIA D.O.
10 JUN -9  PM 6: 20

**EXHIBIT**
P-6
11-28-12 AP

PENGAD 800-631-6989

| ⌐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary for State and local Requirements) | |
|---|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. | |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>x *Shirley Kosakoski*<br>Date *June 6, 2010*    Charging Party | SIGNATURE OF COMPLAINANT<br><br>x *Shirley Kosakoski*<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month and year) *June 6, 2010* | |

## EEOC COMPLAINT OF SHIRLEY KOSAKOSKI

My name is Shirley T. Kosakoski and I am filing this complaint against my employer PNC Bank located at 101 North Pointe Boulevard, Lancaster, PA 17601. Although I worked at this location, the head office of PNC Bank is PNC Financial Services Group, Inc., located at 5th Avenue, Pittsburgh, PA 15222.

I have been employed by PNC Bank, originally Sterling Financial, which was bought out by PNC Bank in August 2008, from May 2007 through to the present. I am a Vice President of Business Banking.

From October 16, 2009 to November 15, 2009 I took Family Medical Leave because of significant medical problems. My employer required that I set forth those problems in detail and despite my discomfort in so doing, I did inform them of the numerous medical issues which afflicted me. When I returned to my job at PNC Bank on or about November 15, 2009, I applied, through my physician, for intermittent Family Medical Leave. Again, PNC Bank required me to set forth in detail the numerous medical problems which I had. Despite the fact that I believe PNC Bank was not entitled to know the details of my medical situation, I set forth in detail the reasons why I required intermittent Family Medical Leave. In addition, I requested certain accommodations. These accommodations included but were not limited to a flex schedule, an ability to connect remotely from home, the ability to see doctors when necessary and the ability to take time off pursuant to the fine tuning of medication. Further, I requested administrative assistance because my customers had grown from 30 to 800. When I had 30 customers when I was at Sterling Financial (later acquired by PNC) I had administrative support, now I was at PNC Bank, I was given no administrative assistance despite the fact that anyone in my position, handling 800 customers would require administrative assistance. In my case, given my medical situation, it was even more critical that I have administrative support and I communicated this to my employer.

Prior to my return to work, and some 3 months in advance, I scheduled a medical appointment with a specialist. I had permission from my supervisor, Robert Shoemaker to see the specialist. However, 3 days prior to my appointment, I was informed that there was a very important meeting for managers. No time was scheduled for this meeting but very shortly before the meeting, I learned it was set for 12:30 p.m. My medical appointment was at 1:00 p.m. and so I informed my supervisor, Mr. Shoemaker, that I could not attend this meeting because of the very important doctor's appointment which had been scheduled, with his permission, some 3 months before. As a direct consequence of my inability to attend that meeting, I was disciplined and written up. I was also negatively evaluated.

My medical appointment was on January 13, 2009 and just a week later, Mr. Shoemaker wrote me up by telling me I was not a good partner and that I had a lack of performance for the final quarter of 2009. It should be noted that at no time during my employment with PNC Bank have I ever been evaluated and therefore, this sudden evaluation was gratuitous, retaliatory and discriminatory in manner. In addition, Mr. Shoemaker deliberately altered the figures for the final quarter of 2009 and took away a month of sales but, that month of sales did not correspond to the 30 days I was on Medical Leave. In effect, he punished me because I had taken Family Medical Leave and because I had a disability which was ongoing and further, because I had requested accommodations.

As a consequence of this clear retaliation I made a complaint to HR through the employee relations hotline. I spoke to Karen Garber who assured me that she would investigate the case. I made my complaints verbally on the basis of violations of the Americans with Disabilities Act and gender discrimination. I also indicated that I was treated in a disparate and discriminatory manner in comparison to the males who reported to Robert Shoemaker. Robert Shoemaker had a group who he called his "rising stars". There were no women in that group. Further, he treated me, as a woman, differently from the males who reported to him. I also made

a complaint of age discrimination. I informed Ms. Garber that there were certain statements made by Robert Shoemaker which were age related and directed towards me such as "I couldn't do your job at our age." Further, earlier in 2009, I had posted for a different position in order to get out from under Robert Shoemaker. This would have been a lateral move for me but Robert Shoemaker was the decision maker and gave the job, a treasury management officer's position, to a 26 year old male who had almost no experience and who of course, was much younger than I. I am 49 years old.

In any event, as stated, I was informed by Karen Garber that she would investigate the matter and let me know the results of her investigation. A month or two later, having heard nothing, I followed up with Ms. Garber and she informed me that I would be getting some kind of disciplinary action as a result of my failure to perform in 2009. She also mentioned that Robert Shoemaker had miscalculated the time on my so-called "lack of performance". I also never received any response regarding my request for accommodations.

In April 2010, Robert Shoemaker either resigned or was terminated from PNC Bank for ethical violations. Once again, I requested a lateral move and asked Lori Lockard, Employment Relations Specialist, to recommend my transfer which she would not do. The job was given to an outsider, Robert J. Walters and on information, I believe I was discriminated against on the basis of my gender and my disabilities with regard to not getting this job. I was informed by HR that we were "equivalent" with respect to our abilities and therefore, I believe that as a woman, I should have received the position. Further, I do not believe that we were "equivalent". I believe that I was better qualified.

Mr. Shoemaker's position was taken over by Carlton Andy Klinger who met with me on May 3, 2010 but never mentioned my accommodations despite the fact that he had my personnel file open in front of him. I also had requested, in addition to administrative support, that I be

moved to a branch office which would have made my commute easier and enabled me to do my job better. These two accommodations were also entirely ignored.

On May 26, 2010, I phoned Lori Lockard to follow up on my requests for accommodations and asked what their status was. At this point, I had not been moved into a branch, I had dysfunctional technology in that I could not print at home and my laptop did not work properly. Ms. Lockard agreed to speak to Mr. Klinger regarding my accommodations and what had previously been agreed upon and told me that she would get back to me very shortly thereafter. As of the filing of this complaint, I have received no response whatsoever from PNC Bank. In addition, I have been left to do my job using dysfunctional and outdated equipment, without administrative or technical support and I believe I have been left to flounder as a consequence of PNC's retaliation of me and their attempts to paper the record, presumably to create more retaliatory documentation to negatively evaluate me and ultimately terminate me from my position.

As a direct consequence of the foregoing, I am filing this complaint for gender discrimination, age discrimination and violations of the Americans with Disabilities Act. I am naming Robert Shoemaker, Lori Lockard, Karen Garber, Carlton Andy Klinger and E. Dennis Ginder as aiders and abettors.

Respectfully submitted,

Shirley Kosakoski

Date: June 6, 2010

RECEIVED – EEOC
PHILADELPHIA,D.O.
10 JUN -9 PM 6:20

## VERIFICATION

I, Shirley Kosakoski, verify that the statements made in the following EEOC Complaint are true and correct to the best of my knowledge, information, and belief, and that this verification is made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

Shirley Kosakoski
Shirley Kosakoski

Dated: June 6, 2010

RECEIVED - EEOC
PHILADELPHIA.D.O.
10 JUN -9 PM 6:20

EXHIBIT

P- 8

11-28-12 AB

PENGAD 800-631-6989

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHIRLEY KOSAKOSKI             :     CIVIL ACTION
102 Crosscreek Lane           :
Lancaster, PA 17602           :
                              :     No. _____
            Plaintiff,        :
                              :
      v.                      :     JURY TRIAL DEMANDED
                              :
THE PNC FINANCIAL SERVICES    :
GROUP, INC.                   :
1 PNC Plaza                   :
249 5th Avenue                :
Pittsburgh, PA 15222-2707     :
                              :
            Defendant.        :

## CIVIL ACTION COMPLAINT

Plaintiff, Shirley Kosakoski, by and through her undersigned counsel, files this Civil

Action Complaint, and hereby avers as follows:

### I.      Introduction

1.    Plaintiff initiates this action to seek redress against the Defendant, her former

employer, for violations of the Age Discrimination in Employment Act ("ADEA"), violations of

the Americans with Disabilities Act ("ADA"), for unlawful gender discrimination and retaliation

in violation of Title VII of the Civil Rights Act of 1964, as amended (hereinafter "Title VII"), the

Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.,* and other applicable law.

### II.     The Parties

2.    Plaintiff, Shirley Kosakoski, is an adult individual currently residing at the above

address.

3.    Defendant, The PNC Financial Services Group, Inc. ("Defendant"), is a corporation,

created and existing pursuant to the laws of the Commonwealth of Pennsylvania and registered

to conduct business in the Commonwealth of Pennsylvania, with a place of business at the above address.

4.   At all times relevant, Defendant acted by and through its agents, servants, and employees, each of whom, at all times relevant, acted within the scope of his or her job duties.

5.   Defendant is an "employer" within the meaning of the Americans with Disabilities Act ("ADA") because it is engaged in an industry affecting commerce and because it maintains or maintained fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

6.   Defendant is an "employer" within the meaning of the Age Discrimination in Employment Act ("ADEA") because it is engaged in an industry affecting commerce and because it maintains or maintained twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

7.   The Defendant is an "employer" within the meaning of Title VII because it is engaged in an industry affecting interstate commerce and because it maintained or maintains fifteen (15) or more employees for each working day in each of twenty (20) or more weeks in the current or preceding calendar year.

8.   The Defendant also maintains a sufficient number of employees to satisfy the jurisdictional prerequisites of the PHRA (requiring four or more employees).

### III.   Jurisdiction and Venue

9.   All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

10.   The Court may properly maintain personal jurisdiction over the Defendant because the Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over the Defendant to comply with traditional notions of fair play and substantial

justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

11.     The United States District Court for the Eastern District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

12.     Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because the Defendant is located in and conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district (the Plaintiff was employed in the Eastern District of Pennsylvania at the time of the illegal actions set forth herein).

## IV.     Procedural and Administrative Remedies

13.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

14.     The Plaintiff has satisfied the procedural and administrative requirements for proceeding under the ADEA, ADA and Title VII as follows:

   a.  On or about June 9, 2010, Plaintiff filed a timely written charge of discrimination (No. 530-2010-02525) against the Defendant with the Philadelphia office of the Equal Employment Opportunity Commission alleging age and disability discrimination and gender discrimination;

   b.  On or about October 27, 2010, Plaintiff filed a timely written charge of discrimination (No. 530-2011-00511) against the Defendant with the Philadelphia office of the Equal Employment Opportunity Commission alleging retaliation;

   c.  The Equal Employment Opportunity Commission issued a Notice of Right to Sue on the foregoing charge on or about September 29, 2011;

    d. On or about October 4, 2011, the EEOC issued a Notice of Right to Sue to Plaintiff;

    e. The instant action is timely because it is initiated within ninety (90) days of the receipt of the aforementioned Notice; and

    f. The Plaintiff also cross-filed the aforementioned charges of discrimination and retaliation with the Pennsylvania Human Relations Commission.

15. The Plaintiff has exhausted her administrative remedies as to the allegations of this Complaint.

## V.    Factual Background

16. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

17. Plaintiff began working for Sterling Financial in May 2007.

18. Sterling Financial was bought out by Defendant in August 2008.

19. Plaintiff is the Vice President of Business Banking.

20. From October 16, 2009 to November 15, 2009 Plaintiff took Family Medical Leave because of significant medical problems.

21. Defendant required that Plaintiff set forth those problems in detail and despite Plaintiff's discomfort in doing so, she did inform them of the numerous medical issues that afflicted Plaintiff.

22. When Plaintiff returned to her job on or about November 15, 2009, she applied through her physician, for intermittent Family Medical Leave.

23. Again, Defendant required Plaintiff to set forth in detail the numerous medical problems that she had.

24. Plaintiff again set forth in detail the reasons why she required intermittent Family Medical Leave.

25.     In addition, Plaintiff requested certain accommodations.

26.     These accommodations included but were not limited to a flex schedule, an ability to connect remotely from home, the ability to see doctors when necessary and the ability to take time off pursuant to the fine tuning of medication.

27.     Plaintiff also requested administrative assistance because her customers had grown from 30 to 800.

28.     When Plaintiff had 30 customers while at Sterling Financial, she had administrative support.

29.     Now while working for Defendant, Plaintiff was given no administrative assistance despite the fact that anyone in her position handling 800 customers would require administrative assistance.

30.     Given Plaintiff's medical situation, it was even more critical that she have administrative support and she communicated this to Defendant.

31.     Prior to Plaintiff's return to work, and approximately 3 months in advance, she scheduled a medical appointment with a specialist.

32.     Plaintiff had permission from her supervisor, Robert Shoemaker, to see the specialist.

33.     However, 3 days prior to her appointment, Plaintiff was informed that there was a very important meeting for managers.

34.     No time was scheduled for this meeting but very shortly before the meeting, Plaintiff learned it was set for 12:30 p.m.

35.     Plaintiff's medical appointment was at 1:00 p.m.

36.     Plaintiff informed her supervisor, Shoemaker, that she could not attend this meeting because of the very important doctor's appointment. which had been scheduled with his permission approximately 3 months before.

37.   As a direct consequence of Plaintiff's inability to attend that meeting, she was disciplined, written up and also negatively evaluated.

38.   A week after this incident, Shoemaker wrote Plaintiff up by telling her she was not a good partner and that she had a lack of performance for the final quarter of 2009.

39.   At no time during Plaintiff's employment with Defendant has she ever been evaluated and therefore, this sudden evaluation was gratuitous, retaliatory and discriminatory in manner.

40.   Shoemaker deliberately altered the figures for the final quarter of 2009 and took away a month of sales.

41.   That month of sales did not correspond to the 30 days Plaintiff was on Medical Leave.

42.   As a consequence of this clear retaliation, Plaintiff made a complaint to HR through the employee relations hotline.

43.   Plaintiff spoke to Karen Garber who assured Plaintiff that she would investigate the case.

44.   Plaintiff made her complaints verbally on the basis of violations of the Americans with Disabilities Act and gender discrimination.

45.   Plaintiff also indicated that she was treated in a disparate and discriminatory manner in comparison to the males who reported to Shoemaker.

46.   Shoemaker had a group who he called his "rising stars".

47.   There were no women in his "rising stars" group.

48.   Plaintiff also made a complaint of age discrimination.

49.   Plaintiff informed Garber that there were certain statements made by Shoemaker which were age related and directed towards Plaintiff such as "I couldn't do your job at our age."

50.   Earlier in 2009, Plaintiff had posted for a different position.

51.     Shoemaker was the decision maker and gave the job, a treasury management officer's position, to a 26 year old male who had almost no experience and who was much younger than Plaintiff.

52.     Plaintiff was 49 years old at the filing of her charge of discrimination.

53.     After a month or two of not hearing anything, Plaintiff followed up with Garber, who informed Plaintiff that she would be getting some kind of disciplinary action as a result of her failure to perform in 2009.

54.     Garber also mentioned that Shoemaker had miscalculated the time on her so-called "lack of performance."

55.     Plaintiff also never received any response regarding her request for accommodations.

56.     In April 2010, Shoemaker either resigned or was terminated from PNC Bank for ethical violations.

57.     Plaintiff again requested a lateral move and asked Lori Lockard, Employment Relations Specialist, to recommend Plaintiff's transfer, which she would not do.

58.     The job was given to an outsider, Robert J. Walters.

59.     Plaintiff was informed by HR that Plaintiff and Walters were "equivalent" with respect to their abilities.

60.     Shoemaker's position was taken over by Carlton Andy Klinger who met with Plaintiff on or about May 3, 2010, but never mentioned her accommodations despite the fact that he had Plaintiff's personnel file open in front of him.

61.     Plaintiff had also requested, in addition to administrative support, that she be moved to a branch office.

62.     This accommodation was also entirely ignored.

63.     On May 26, 2010, Plaintiff phoned Lori Lockard to follow up on her requests for accommodations and asked what the status was.

64.     At this point, Plaintiff still had not been moved into a branch and had dysfunctional technology such that her laptop did not work properly and she could not print from home.

65.     Ms. Lockard agreed to speak to Mr. Klinger regarding Plaintiff's accommodations, which had previously been agreed upon, and told Plaintiff that she would get back to her very shortly thereafter.

66.     As a direct consequence of the foregoing, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on June 9, 2010 alleging gender discrimination, age discrimination and violations of the Americans with Disabilities Act.

67.     Since filing an EEOC complaint, Plaintiff has been retaliated against in a number of ways.

68.     There was no action on her accommodation requests.

69.     Defendant evaded Plaintiff's questions and retaliated against her by compiling a derogatory, bogus and unjustified performance review.

70.     Plaintiff was not allowed to see this review but it generated a rating on Defendant's HR System which prevented Plaintiff from being reassigned.

71.     Plaintiff was allegedly ineligible due to "substandard performance."

72.     In addition, the environment Plaintiff worked in became increasingly stressful and hostile.

73.     Plaintiff received two phone inquiries in September 2010 from the Audit Department attempting to implicate Plaintiff in noncompliance with regulatory requirements on new account paperwork.

74.     Plaintiff had records which clearly showed she did nothing wrong and she was cleared of any wrong doing in both situations.

75.     Two promotions were granted to male employees with less experience and fewer qualifications than Plaintiff.

76.     These positions opened up after Plaintiff requested a reassignment and Plaintiff was qualified for both positions. .

77.     These positions fit Plaintiff's area of expertise.

78.     However, Plaintiff was never considered for either of them.

## Count I
### Age Discrimination in Employment Act

79.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

80.     By virtue of her age (49 at the time of discrimination), Plaintiff is in the class of persons protected by the Age Discrimination in Employment Act of 1967.

81.     The foregoing conduct constitutes unlawful age discrimination against Plaintiff.

82.     As a result of Defendant's unlawful discrimination, Plaintiff has suffered damages as set forth herein.

     *WHEREFORE*, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra.*

## Count II
### Americans with Disabilities Act

83.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

84.     Plaintiff suffers from a "disability" as that term is defined in the ADA because Plaintiff has or had, at all times relevant hereto, a physical impairment that substantially limits/limited one or more major life activities, or because Plaintiff had a record of such an impairment.

85. Plaintiff also suffers from a "disability" as that term is defined in the ADA because Plaintiff was regarded as and/or perceived by Defendant and its agents as having a physical impairment that substantially limits/limited one or more major life activities.

86. Plaintiff is a "qualified individual with a disability" as that term is defined in the ADA because he has, or had at all times relevant hereto, a physical impairment that substantially limited/limits one or more major life activities, or because he had a record of such impairment.

87. Plaintiff also is a "qualified individual with a disability" as that term is defined in the ADA because she was regarded as and/or perceived by Defendant and its agents as having a physical impairment that substantially limited/limits one or more major life activities.

88. Plaintiff is a "qualified individual with a disability" as that term is defined in the ADA because Plaintiff was able to perform all of the essential functions of the job, with or without a reasonable accommodation.

89. The foregoing conduct by Defendant constitutes unlawful discrimination against Plaintiff on the basis of her disability or perceived disability.

90. In retaliating against Plaintiff as result of her disability and/or perceived disability, Defendant violated the ADA.

91. As a result of Defendant's unlawful discrimination, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks that damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## Count III
## ADA – Retaliation

92. All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

93.    In complaining to Defendant about disability discrimination, the Plaintiff engaged in protected activity.

94.    The foregoing conduct by the Defendant constitutes unlawful retaliation against the Plaintiff.

95.    As a result of the Defendant's unlawful retaliation, the Plaintiff has suffered damages as set forth herein.

**WHEREFORE,** the Plaintiff seeks the damages set forth in the *Ad Damnum* Clause of this Complaint, *infra.*

### Count IV
### Title VII – Gender Discrimination

96.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

97.    The foregoing conduct by the Defendant constitutes unlawful discrimination against the Plaintiff on the basis of her gender.

98.    As a result of the Defendant's unlawful discrimination, the Plaintiff has suffered damages as set forth herein.

**WHEREFORE,** Plaintiff seeks the damages set forth in the *Ad Damnum* clause of this Complaint, *infra.*

### Count V
### Pennsylvania Human Relations Act

99.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

100.    The foregoing conduct by Defendants also violates the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.*

101.    As a result of Defendants' violations of the Pennsylvania Human Relations Act, Plaintiff has suffered damages, as set forth herein.

*WHEREFORE*, Plaintiff seeks the damages set forth in the *Ad Damnum* clause of this Complaint, *infra.*

### AD DAMNUM CLAUSE/PRAYER FOR RELIEF

*WHEREFORE*, the Plaintiff prays that the Court enter judgment in her favor and against the Defendant and that it enter an Order as follows:

a.    The Defendant is to be permanently enjoined from discriminating against the Plaintiff on the basis of her age, disability, gender and/or any basis prohibited under applicable federal and state law;

b.    The Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of discriminating against employees based on their age, disability and/or gender and is to promulgate an effective policy against such discrimination and to adhere thereto;

c.    The Defendant is to compensate the Plaintiff, reimburse the Plaintiff, and to make the Plaintiff whole for any and all pay and benefits the Plaintiff would have received had it not been for the Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. The Plaintiff should be accorded those benefits illegally withheld from the date she first suffered discrimination at the hands of the Defendant until the date of verdict;

d.    The Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to her by the Defendant's actions;

e.    Double damages are to be awarded for willful violation of the ADEA;

f.    The Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish the Defendant for its

willful, deliberate, malicious, and outrageous conduct, and to deter the Defendant or any other employees from engaging in such misconduct in the future;

g. The Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

h. The Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

i. Any verdict in favor of the Plaintiff is to be molded by the Court to maximize the financial recovery available to the Plaintiff in light of the caps on certain damages set forth in applicable federal law;

j. The Plaintiff is to be granted such additional injunctive or other relief as he may request during the pendency of this action in an effort to ensure the Defendant does not engage – or ceases engaging – in illegal retaliation against the Plaintiff or other witnesses in this action;

k. The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein; and

l. The Plaintiff's claims against the Defendant are to receive a trial by jury to the extent allowed by applicable law. The Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

KOLMAN ELY, P.C.

By: /s/ Timothy M. Kolman, Esquire
Timothy M. Kolman, Esquire
Wayne A. Ely, Esquire
Eman Abouelseoud, Esquire
Lalena J. Turchi, Esquire
Attorneys for Plaintiff
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134

January 4, 2012

*2008- 2009 Performance Appraisal*

## 2009 Commitment & Alignment Conversations

| Employee Name: KOGAKOSKY,SHIRLEY | Employee #: 17954849 |
|---|---|
| Job Title: BUSINESS BANKER III | Supervisor Name: SHOEMAKER,ROBERT C |

Commitment Conversation:     Compensation Conversation: *12/11/09*

| Check In Conversations | | | |
|---|---|---|---|
| 1: | 2: | 3: | 4: |
| 5: | 6: | 7: | 8: |
| 9: | 10: | 11: | 12: |

Commitment Period From: *5/08*   To: *5/09*

| Performance |
|---|
| Summary: This performance review is to cover the employment period May 2008-May 2009. By mistake, Shirley did not receive a performance review in May, 2009. The supervisor was relying on the "Employees for Current Review" section of the performance management software to trigger a review, which inadvertently did not include Shirley. This was systemic to the Sterling conversion as other employees had similar circumstances. |
| Shirley, as a Business Banker aligned w/ the North Pointe, Lititz, and Manheim branches, successfully onboarded her Sterling portfolio into PNC. It is to be noted that Shirley was aligned w/ the Sterling Middle Market Team, and several of her accounts ultimately were assigned to the corporate and commercial segments after the merger (ex: UDS, AES, Landis Homes, Mennonite Home). All transfers were handled professionally by Shirley; and consumed considerable time and attention. Additionally, Shirley assumed the majority of a portfolio previously managed by a retiring Sterling Community Business Banker, Don Shelly in the Manheim/Lititz market. Shirley successfully transitioned the majority of the portfolio, and was also responsive in assisting the exiting of several clients (predominatley in the auto industry) not modeled to retain post merger. |
| Shirley, in the period being reviewed, devoted herself to learning systems, processes and products necessary to be a successful Business Banker.  She worked hard to be organized, resourceful (working without an RA), and prioritized customer requests for assistance during the merger. This consumed considerable time and challenged production of new business in the priority areas of DDA, Merchant, and Treasury. Shirley worked to establish a strong working relationship with her Branch Managers; growth was challenged by time and client expectations. |
| Shirley was engaged at all times in Sales Meetings, Boat Meetings, 1-1 meetings w/ her supervisor, and adhered to proper risk management procedures. |
| Current Rating: Achieves     Current Rating Date: 12/01/2009 |
| Prior Ratings/Dates:<br>        NEV – 01/01/2008<br>        – 01/01/1901 |

| Competency Review - Strengths |
|---|
| Strength 1: Dilegence in learning new systems, procedures, and products |
| Strength 2: Ability to assess an opportunity acurately |
| Strength 3: Desire to win and make a positive, lasting impression |

| Competency Review - Area For Development |
|---|
| Area: Areas for Development outlined in meeting September, 2009. |
| Action: |
| By When: |
| Status: NEW |

| Comments |
|---|
| Employee: |
| Supervisor: Shirley, during period being reviewed, worked diligently to achieve a successful merger for her clients and herself. As outlined, the challenges of her current and inherited portfolio, as well as the # of households in her 3 market have presented ongoing challenges. The September, 2009 conversation outlined performance for the first 6 months of 2009, as well as outlined activities and priorities going forward. |



EXHIBIT P-10 11-29-12 AP

PNC 179

**Employee Signatures:**

My supervisor has discussed this performance review with me.

Employee Signature: _[signature]_   Date: 12/2/09

Your signature below acknowledges that you have received and read the Code of Business Conduct and Ethics, understand them, and will comply with them.

Employee Signature: _[signature]_   Date: 12/2/09

**Supervisor Signature:**

I have discussed this performance review with my employee.

Supervisor Signature: _[signature]_   Date: 12/1/09

Shirley Kosakoski Conversation Highpoints (9/10/09)

**Production:**

DDA thru June; 9 versus goal of 24, or 38% of goal

Merchant thru June: 5 versus goal of 6, or 83% of goal

Treasury Revenue Credits: 42,800 versus goal of 90,000, or 48% of goal

Total Revenue Credits thru June: 153,830 versus goal of 450,000, or 34% of goal

Total Loan Originations thru June: $714,750 versus goal of $1,800,000, or 40% of goal

Activities:

Shirley approaches position with an optimistic, professional attitude. Has worked diligently (time and effort) to onboard existing relationships, most of which are new to her and her portfolio (Shirley is new to Business Banking, coming from Middle Market, and has inherited the dominant share of her portfolio from D. Shelly, retired, and J. Owen, transferred).

Healthcare portfolio has been, for the most part, transferred to the Corporate Banking Team. Large accounts like AES and UDS have been migrated to the Business Advisor Team.

Effort in place to instill more confidence in the Branch Managers Shirley has partnered with in the Market (NP, LZ, Manheim). Challenges remain in dedicating sufficient time in each location to be a true ally to Branch Teams. Meetings frequently need re-scheduled due to current events. Overall, confidence of Branch Managers needs to increase.

Administrative time in researching and resolving various customer issues appears to dominate energy and time. Shirley has discovered quirks and abnormalities to a degree higher than her peers.

Schedule (calendar) shows effort in area of planned business development and blitzing events, with room to expand those strategies suggested and look to a longer scheduling horizon.

Forward Expectations and Priorities:

Regularly (average over rolling 3 month periods), beginning in September, 2009, achieve the major monthly components of production: DDA- 4 units, Merchant- 1 unit, Treasury- 15,000 revenue credits, Loan Originations- $300,000, and Total Revenue Credits- 75,000.

Measurably increase the percentage of Business DDAs opened by Shirley to the # opened by branch. Currently the percentage stands at 22%. Had Shirley opened 50% of the Business DDAs, she would have opened 19(e), or 80% of goal.

Work diligently to re-direct administrative burden to MLM, MDM, TM Sales Assistant, Sales Team Assistant, and BBSM. Create boundaries for investment of time per day on non-sales activity.

**REDACTED**

**2009 PRODUCTION RANKINGS**

EXHIBIT
P-11
11-26-12

| 2009 Production TOTAL REV CREDITS | |
|---|---|
| BANKER | 2009 TOTAL |
| | 1,131,043.21 |
| | 923,915.44 |
| | 708,145.88 |
| | 631,901.43 |
| | 605,744.00 |
| | 605,387.71 |
| | 586,277.83 |
| | 531,319.48 |
| | 473,540.20 |
| Shirley Kosakoski | 432,517.00 |
| TEAM TOTALS | 6,629,792.18 |

| 2009 Production MONEY MARKET | |
|---|---|
| BANKER | 2009 TOTAL |
| | 14 |
| | 14 |
| | 14 |
| | 14 |
| | 14 |
| | 12 |
| | 12 |
| Shirley Kosakoski | 8 |
| | 8 |
| | 1 |
| TOTALS | 111 |

| 2009 Production LOAN DOLLARS | |
|---|---|
| BANKER | 2009 TOTAL |
| | $6,128,191.00 |
| | $3,633,166.00 |
| | $2,433,681.00 |
| | $2,251,752.00 |
| | $2,137,567.00 |
| | $1,983,042.00 |
| Shirley Kosakoski | $1,967,750.00 |
| | $1,438,500.00 |
| | $686,944.00 |
| | $355,000.00 |
| TOTALS | $23,015,593.00 |

| 2009 Production MERCHANT | |
|---|---|
| BANKER | 2009 TOTAL |
| | 27 |
| | 22 |
| | 21 |
| | 20 |
| | 20 |
| | 16 |
| | 12 |
| | 9 |
| Shirley Kosakoski | 8 |
| | 4 |
| TOTALS | 159 |

| 2009 Production DDA | |
|---|---|
| BANKER | 2009 TOTAL |
| | 84 |
| | 74 |
| | 58 |
| | 46 |
| | 42 |
| | 39 |
| Shirley Kosakoski | 26 |
| | 22 |
| | 22 |
| | 10 |
| TOTALS | 423 |

| 2009 Production TREASURY | Revenue Credit | Units |
|---|---|---|
| BANKER | 2009 TOTAL | |
| | 556,150 | 84 |
| | 209,350 | 62 |
| | 90,200 | 24 |
| Shirley Kosakoski | 87,500 | 21 |
| | 81,700 | 25 |
| | 76,500 | 27 |
| | 72,550 | 21 |
| | 67,500 | 20 |
| | 36,500 | 11 |
| | 10,000 | 4 |
| TEAM TOTALS | 1,265,950 | 299 |

Shirley Kosakoski-written performance warning-February 1, 2010

**Production and Activities:**

On September 10, 2009, in a verbal warning (of which a copy was supplied to incumbent), production and activities were discussed as well as forward expectations and priorities. Since that date, sufficient progress has not been accomplished. It is to be noted Shirley was on a leave of absence from 10/16 thru 11/13. For performance against minimum production expectations, the months September, October and December, 2009 were reviewed in light of leave of absence, with the following results:

| Category | 3 month average | minimum/month |
|---|---|---|
| DDA | 4.3 | 4 |
| Merchant | .33 | 1 |
| Loans | $29,300 | $300,000 |
| Treasury R/Cs | 12,100 | 15,000 |
| Total R/Cs | 36,143 | 75,000 |

Additionally, expectations for partnering with branch managers were outlined to increase the confidence the managers have in Shirley. Managers and their Regional met with the BBSM on January 13, 2010 to express their continued frustration. The major points of frustration included commitment to their respective branches, tardiness, follow through on commitments, and lack of a business development plan/effort. Their angst was amplified by Shirley needing to leave a meeting of all branch managers that same day.

BBSM observes Shirley being challenged with pace and requirements of position, as evidenced by struggles in complying with timelines for pipeline entries for SA, training sign up, individual production goal and C&A requests, and hitting production minimums.

**Forward Expectations:**

Monthly Production Requirements:

DDA- 4
Merchant-1
Treasury Revenue-15,000
Loan Origination-$300,000
Total Revenue Credits-75,000

Ongoing Requirements:

Clear evidence of a plan for improvement in relationship/engagement with Branch Managers. (NOTE: Meeting scheduled for 2/1/2010)



EXHIBIT
P- 13
11-28-12

PENGAD 800-631-6989

PNC 177

Adherence to timelines for requested information requested as a member of the Lancaster Team.

**Summary:**

Immediate and sustained improvement needs to be shown and maintained or further corrective action up to and including termination of employment may occur.

**Employee Response:**

Please sign to acknowledge this corrective action was discussed with you and that you have a copy of this document. This document will be placed in your personnel file in Human Resources.

_____ Manager          2-1-10 Date

_____ Employee          _____ Date



*EXHIBIT*
*P-14*
*1-26-12 N*

*2/1/10*
*p.1*

Shirley Kosakoski-written performance warning-February 1, 2010

Production and Activities:

On September 10, 2009, in a verbal warning (of which a copy was supplied to incumbent), production and activities were discussed as well as forward expectations and priorities. Since that date, sufficient progress has not been accomplished. It is to be noted Shirley was on a leave of absence from 10/16 thru 11/13. For performance against minimum production expectations, the months September, October and December, 2009 were reviewed in light of leave of absence, with the following results:

| Category | 3 month average | minimum/month | |
|---|---|---|---|
| DDA | 4.3 | 4 | Bob's #'s threw out |
| Merchant | .33 | 1 | 91,000+ in Rev. Credit |
| Loans | $29,300 → $313,000 | $300,000 | and counted my 30 day |
| Treasury R/Cs | 12,100 | 15,000 | FML time as active... |
| Total R/Cs | 36,143 ↑ 153  53,440 = 151,082 | 75,000 | |

Additionally, expectations for partnering with branch managers were outlined to increase the confidence the managers have in Shirley. Managers and their Regional met with the BBSM on January 13, 2010 to express their continued frustration. The major points of frustration included commitment to their respective branches, tardiness, follow through on commitments, and lack of a business development plan/effort. Their angst was amplified by Shirley needing to leave a meeting of all branch managers that same day.

*Noted to Bob that None of this addressed on 9/10/09.*

BBSM observes Shirley being challenged with pace and requirements of position, as evidenced by struggles in complying with timelines for pipeline entries for SA, training sign up, individual production goal and C&A requests, and hitting production minimums.

*Bob advised me to not worry so much about clerical work in fact, instructed me to engage his SA, and the MLM, MDM.*

*In fact Bob noted that I had efforts in place to address this and I had effort in business development plan.*

Forward Expectations:

Monthly Production Requirements:

*Bob and I discussed C&A's verbally since 12/1/09 and agreed to finalize today 2/1/10, in writing. Also, other BB's were given same opportunity and had not yet submitted C&A's - per Bob.*

DDA- 4
Merchant-1
Treasury Revenue-15,000
Loan Origination-$300,000
Total Revenue Credits-75,000

Ongoing Requirements:

*Bob did not address this as a deficiency in prior conversations. I addressed it as a challenge that I need assistance with 137 to him and to Lisa Whitacre. I also asked that if we cannot come up with strategies or*

Clear evidence of a plan for improvement in relationship/engagement with Branch Managers. (NOTE: Meeting scheduled for 2/1/2010) ———— *Did this*

2/1/10
p. 2

that I would request re-assignment
(which I ultimately did)   so as not
to hurt his team's productivity and
to better utilize my strengths at PNC.

2/1/10 p. 3

Adherence to timelines for requested information requested as a member of the Lancaster Team.  ——→ This was not previously noted in conversation, so how can you include in Corrective Action ?

Summary:

Immediate and sustained improvement needs to be shown and maintained or further corrective action up to and including termination of employment may occur.

Employee Response:

Please sign to acknowledge this corrective action was discussed with you and that you have a copy of this document. This document will be placed in your personnel file in Human Resources.

_____ Manager        _____ Date

_____ Employee       _____ Date

139

Page: 1 Document Name: untitled

DDA

Jan'10 + Dec '09

The chart below summarizes my sales since the Sept 2009 Conversation.

In light of my FML absence, I did achieve the required goals on a rolling monthly average, starting in Sept. I have /You can obtain' all the screen shots to document my numbers.

02/02/2010 16:52:23
UNITS SOLD
INCENTIVE SEG: R3
                MRKT
PH72473    EMPL

IAL    _ UNITS REFERRED

DECEMBER 2009

| | | |
|---|---|---|
| | 0 | 0 |
| | 0 | 0 |
| | 1 | 0 |
| | 0 | 0 |
| | 0 | 0 |
| | 0 | 0 |
| | 0 | 0 |
| TOTAL Business DDA | 6 | 6 | 5 |
| Business MM | | | |
| Bus PF MMDA | 0 | 0 | 0 |

PF: 2-CLEAR     3-EXIT     4-TRND LEFT     5-TRND RIGHT     6-SUM RPT     7-PAGE UP
    8-PAGE DWN 9-LVL UP 10-LVL LEFT 11-LVL RIGHT 12-SF72     21-LVL DOWN

| | DDA Mo/Run Avg | Loans m/RA | MS m/RA | TM m/RA | RC m/RA | 3,A5? |
|---|---|---|---|---|---|---|
| Sept | 4/ N/A | -/- | | 24,100/- | 48,720/N/A | (3) ✓ |
| Oct | 4/5.3 (÷1.5) | 25K/25K | 0/.161 (A465) | 5200/ | 20,387/ N/A | (2) |
| Nov | 0/4.7 (8÷2) | 832,280/416,140 | | 0/18,150/ (÷2) | 96,284/ 7,08K | (5) |
| Dec | 5/4.5 (9÷2) | 88,440/440,440 | 0 | 0/7600 (15,200÷2) | 23,201/ 25K | (3) |
| Jan | 6/4.4 (11÷2.5) | 0/306,913 | | 0/0 | 34,000/ 55,200 | Yes (3) |

Mo. Run. Av. Since Sept'09 / Rolling 3 mo Avg

Sept-Oct-Nov = 176,491 /÷2 mo working = 88,245

Oct-Nov-Dec = 151,032 /÷2mo working = 75,516
                                    140
(Nov-Dec-Jan = 138,000 /÷2.5 mo working  = 55,200) — Don't have Jan Final
                                                        RC #'s

## 2010 Commitment & Alignment Conversations

| Employee Name: KOSAKOSKI,SHIRLEY T | Employee #: 173548491 |
|---|---|
| Job Title: BUSINESS BANKER III | Supervisor Name: KLINGER,CARLTON |

Commitment Conversation:    Compensation Conversation:

| Check-In Conversations: | | | |
|---|---|---|---|
| 1: 01/19/2010 | 2: 02/01/2010 | 3: 03/02/2010 | 4: 04/09/2010 |
| 5: | 6: | 7: | 8: |
| 9: | 10: | 11: | 12: |

### Commitment Period From: 01/01/2010  To: 12/31/2010

**Commitment 1 - Status: IN PROGRESS**

Commitment:  Meet Production Goals in all categories as follows (expressed monthly): DDA-4, Merchant- 1, Loans- $300,000, Treasury- 15,000 rc's. Show commitment to calling with partners on a monthly basis to include TMO, Merchant AE, respective BMs, and BBSM.

Measures:    Production Report
Review of Lotus Notes calendar to observe appointment for calling

Employee Assessment:

Supervisor Assessment:  Mar-January Production: DDA-6, Merchant-1, Loans- 0, Treasury- 0, Total rc's: 23,784
February Production: DDA-2, Merchant-1, Loans- 0, Treasury- 2/6,500, Total rc's: 32,828

Calendar to be reviewed at 1-1

Apr-March Production: DDA-4, Merchant-0, Loans-0, Treasury-2/13,000, Total rc's: 17,638
Calendar for week of 3/29-4/4 shows in branch commitments at NP and LZ, and time w/ TMO. Does not illustrate any prospecting (other than branch time) or Book calling commitments. Calendar for week of 4/5-4/11 shows in branch commitment at MH and Treasury Calls. Joint call w/ BA and an LOC closing .Does not illustrate any prospecting (other than branch time) or Book calling comitments.

**Commitment 2 - Status: IN PROGRESS**

Commitment:  Book of Business-illustrate comprehensive review and strategy for all Book clients, incorporating partners to broaden relationships and increase profitabilily.

Measures:    All clients to be contacted 4 times/year including 2 face to face (one of which to include full CFO conversation and utilizing Cash Flow Optimizer).
Monitor revenue changes
All contacts loaded
RIQ Measurement beginning 4/1/2010. Goal for RIQ: 4.60 or better

Employee Assessment:

Supervisor Assessment:  Mar-Book edits from 2009 not yet accomplished by support team.
Contact loading progress to be checked at 1-1 in preparation for RIQ
Call volume on Book to be checked at 1-1 w/ emphasis on LOC clients up for renewal

Apr-contacts loaded as of 3/2 report: 23
Revenue trend for Book to be reviewed at 1-1
Working on 8 specific Book clients from Shirley's Book that a Wealth BA intended to retain. The BA has resigned, BBSM working w/ Wealth leadership to decision w/ priority for all appropriate accounts to remain in Shirley's Book.

**Commitment 3 - Status: NEW**

Commitment:  CIQ for Business Banking w/l 3 branch circuit w/ Goal of 4.77 or better
CIQ for Retail

Measures:    Measure Business Banking CIQ from Coleman Shop Reports
Monitor Retail CIQ from weekly shops and collective reports

Employee Assessment:

Supervisor Assessment:  Mar-CIQ for Buisness Banking for current period reported (1/24-2/12) shows excellent results for Manheim and North Pointe. Llitz (weeks 5 and 6) shows 2 shops with perfect 5's, 2 with a mix of 4's and 5's and 1 with scores ranging from 1 to 4.

Retail CIQ to be reviewed going forward.

Apr-Week 11: 4.80ll Week 12: 4.73 (two all 5's and one marginal shop at NP)



PNC 183